KING *against* STOW.

Where a mortgage, taken by two loan office commissioners of the county of *Essex,* had become forfeited, and the land was regularly advertised and sold, pursuant to the act, (sess. 9. ch. 40.) except that one of the commissioners was not present at the time the order for the advertisement of sale was made, nor at the sale : *Held,* that the assent of the absent commissioner was to be presumed, as no dissent was, afterwards, expressed by him, and he united in the deed to the purchaser ; and though it is the duty of both the com- missioners to be present at the sale, yet the absence of one of them from necessity, or just cause, which was to be presumed in this case, would not affect the validity of a sale, otherwise regular and fair. And though the commissioners neglected to make all the proper minutes or entries in a book of their proceedings, accord- ing to the directions of the act, yet an omission, on their part, in this respect, will not vitiate or defeat the sale itself as against a, *bona fide* purchaser.

Where the advertisement of sale was affixed up by the commission- ers, at the court house and two public taverns, in the village of *E.,* being the three most public places in that village, which is a place of the greatest resort in the county : *Held,* that this was sufficient, as the act did not necessarily require, that advertisements should be put up in three different villages or towns, and the practice of the commissioners, in *Essex* county, had been uniformly otherwise.

But, admitting that the commissioners erred in their construction of the act, in this respect, yet a mere error of judgment, where there was no fraud, or pretence for imputing fraud, but every thing was intended to be fair and regular, will not vitiate the sale as against a *bona fide* purchaser, for a valuable consideration, without notice of any irregularity or omission on the part of the commissioners.

*HENRY BAGLEY,* on the 17th of *August,* 1808, *Sept. 30th.* mortgaged to the *Loan Officers of Essex* county, fifty acres of land, in the town of *Crown Point,* to secure a loan of seventy-four dollars, under the act of the 11th of *April,* 1808. The interest was regularly paid up to the first *Tuesday* of *May,* 1817. The mortgaged premises were

1822.

KING
v.
STOW.

purchased by the plaintiff, upon execution, in 1817, for fifty dollars, under a judgment of the 17th of *July*, 1815, against *Bagley*, in favour of *David Comfort*.　The interest due on the mortgage, on the first *Tuesday* of *May*, 1818, was not paid, and the mortgaged premises became absolutely forfeited.　On the day when it became the duty of the commissioners to advertise the land for sale, for default of payment, *Monvah Miller*, one of the commissioners, was present, and *Isaac Finch*, the other, was absent ; and *Norman Nicholson*, who acted as clerk to the commissioners, drew up the advertisement of sale, and put the name of *I. F.* to it, in the presence and under the observation of *Miller*, who took the advertisement, and employed the printer of the *Essex Patriot* to print it, and affix copies on the court house door, in the village of *Elizabethtown*, and on the doors of two public inns, in that village.　These were the only advertisements made and published.　On the day of sale, which was the 15th of *September*, 1818, *M.* was present at the time and place, and *F.*, the other commissioner, was absent.　The premises were exposed to sale, and struck off to the defendant, for eighty-seven dollars and seventy-six cents, and a deed given to him, executed by both commissioners.　Annually, since 1808, more or less land, lying in distant parts of the county, has been advertised for sale, for default of payment of interest, and it had been the invariable practice to advertise and publish in the manner above mentioned, and in no other way.　The village of *Elizabethtown* is the most public place in the county, and where the commissioners keep their office.　The premises are situated on the bank of *Lake Champlain*, twenty miles distant from the village of *Elizabethtown*.　They lie about a mile and a half south of the old fort of *Crown Point*, and a public road has, for more than fifteen years, passed through the premises.　Since 1814, two public ferries have been uninterruptedly maintained within two miles and a half south of

the premises.  *Catlin's Mills* are four miles from the premises, where there is a saw and grist mill, · a carding machine, a clothier's mill, a blacksmith's shop, a tavern, post-office, and store, and several small buildings.  This place, however, is of little resort or notoriety, compared to the village of *Elizabethtown*, which is far superior in population, buildings, and business, and the most public place, and of the most general resort in the county.  There were other public places in the county, as the village of *Essex*, and the upper falls of *Lake George*.  At the time of the sale by the commissioners, the plaintiff owned the half of 220 acres of land, in *Crown Point*, occupied by *Alexander Trimble*, and within a quarter of a mile of the premises.  In the endorsement on the mortgage, of the sale to the defendant, the name of *I. Finch*, commissioner, was written by *N. Nicholson*, the clerk of the board, in the absence of *F.*, but under the observation of the other commissioner, *M.*  The mortgage book contains no other memorandums but the annual payments of interest, and the above sale.  In the memorandum, or minute book, kept by the commissioners, the mortgage is entered, and the default, and the advertisement of sale, but there were no other entries.  At the time of sale, the defendant was not apprized of any irregularity or omissions in the proceedings of the commissioners.  The plaintiff knew nothing of the existence of the loan office mortgage, until after the sale, and is willing to pay the expense of the sale, and indemnify the defendant.  The premises were estimated to be worth about 600 dollars.  The plaintiff resided in *Albany*, and the defendant in the village of *Elizabethtown*.

The facts, as above stated, were agreed to by both the parties, (who are officers of the Court) ; and it was, also, agreed, that a decree might be entered, that the sale was valid or void, according to the opinion of the Court, without costs.

*King*, the plaintiff, in person.

1822.          *Stow*, the defendant, in person.

KING
v.            THE CHANCELLOR.    The plaintiff contends, that the
STOW.     sale by the commissioners was void, for the following rea-
sons :

1. Because, *Isaac Finch*, one of the commissioners, was
not present with the other when the order for the adver-
tisement, and the sale, in pursuance thereof, were made.

2. Because, there was not a proper entry in the book, by
the commissioners, of their proceedings in relation to the
sale.

3. Because, the advertisement of the sale was not duly
published, as the act required.

1. It is admitted in the case, that the yearly interest,
due in *May*, 1818, was not paid, and the commissioners,
by reason of that default, became seised of an absolute
estate, in fee, in the lands mortgaged, and the mortgagor,
and his heirs and assigns, were utterly foreclosed and barred
of all equity of redemption.    It then became the duty of
the commissioners, " within eight days after the last *Tues-
day* of their attendance in *May*, to cause advertisements to
be fixed up at not less than three of the most public places
of the county, &c., describing the lands, &c., and giving
notice, that on the third *Tuesday* in *September*, in the same
year, they were to be sold at the court house of the coun-
ty."    The case states, that *M. M.*, one of the commission-
ers, and *N. N.*, who acted as clerk to the commissioners,
caused the advertisements to be drawn and fixed up, and
that *I. F.*, the other commissioner, was not present, though
his name was put to the advertisement.    I have no doubt,
that the order for advertising, and the designation of the
places at which the advertisements were to be fixed up,
ought to be the joint act, and the result of the joint deli-
beration of the commissioners, for the statute intended,
that all the essential duties of the trust should be perform-
ed by two commissioners, and not by one.    But the act

does not point out any specified *day*, or *place of meeting*, of the commissioners, for the purpose of causing advertisements to be made and published. It only says, that " the commissioners shall, *within eight days after*, &c. *cause advertisements* to be fixed up," &c. The advertisement may be fixed up by an agent, for the commissioners are only to *cause* it to be done ; and, as no day and place is given for doing the act, or making the order, and it is only to be done " within eight days after," &c., there was no need of any formal meeting of the commissioners. The assent of both to the manner and mode of advertising, is to be presumed, and especially when no dissent was, afterwards, expressed, and when both the commissioners, afterwards, united in the deed to the purchaser. The joint will of both the commissioners might have been given, and sufficiently communicated to each other, though both of them were not actually present when the advertisements were drawn by their clerk. We are to presume, that the joint deliberation and will had *preceded* that act of the clerk, spoken of in the case. It is stated, that " *on the day* when it became the duty of the commissioners to advertise," &c., *M.*, one of the commissioners, and *N.*, the clerk, were present, and *F.*, the other commissioner, was absent. As there was no particular day for advertising, and it was only required to be " within eight days," &c., the case must refer to the last of the eight days, for on that day only was the duty imperative ; and this circumstance strengthens the presumption, that the commissioners had deliberated together " within the eight days," and that the one commissioner, on the last day, met the clerk, merely for the purpose of *executing* the will of the commissioners.

But the case states, that at the day of sale, at the court house in the village of *Elizabethtown*, *F.*, one of the commissioners, was also absent, and the deed to the defendant, as purchaser, was sent by express to *F.*, the absent com-

missioner, for execution. The question is, whether the presence of both the commissioners at the sale was requisite to render the sale valid. It is to be presumed, that the sale was fairly made and conducted, and that the presence of *F.*, the commissioner, who was absent, would not, in fact, have been of any utility, or affected the course of the proceeding. The act says, " the commissioners shall, on the third Tuesday of *September*, expose the lands in the mortgages foreclosed as aforesaid to sale, at public vendue." I think the better construction of the act to be, that it is the duty of both the commissioners to be present at the sale, in order to superintend it, and to see that it is conducted with discretion and fairness. But I do not see sufficient reason to conclude, that the validity of the sale (if otherwise fair) can be affected by the absence of one of the commissioners at the time of the outcry by the auctioneer and the fall of the hammer. The act makes no provision for any interruption of the sale by the necessary absence of one of the commissioners, by reason of sickness or other just cause; it provides only for the case of a failure of the sale from the want of a person to bid, or who shall not pay after the land has been struck off to him; and I cannot suppose that the necessary absence of one of the commissioners would absolutely defeat the sale, and require the delay and expense of new advertisements. The act would have made provision for the case, if such a result, from such a cause, had been within the purview of it. In the present case, the absent commissioner (and, as I presume, on the day of the sale) assented to and ratified the sale, by executing the deed to the purchaser. *F.*, the commissioner, who was absent, might have been absent for some just cause, or from absolute necessity, and as nothing appears in the case as to the cause of his absence, the intendment must be in his favour. And whether he was absent with or without a sufficient excuse, yet, as the sale was regularly and fairly conducted by the other commissioner, and the act of

sale ratified by the joint act of both the commissioners, I conclude that the title of the purchaser cannot, and ought not, to be affected, by either of the circumstances contained in this first objection.

2. The act requires that the commissioners shall, in a proper book for the purpose, minute the substance of each mortgage, and likewise insert therein the minutes of their proceedings; and, among other things, they " shall enter the orders for, and the copies of the advertisements for sale, and places at which they are set up, and the persons' names who set them up, and the names of the purchasers of lands, and the prices sold for," &c.

It appears from the case, that the commissioners very imperfectly executed this part of their duty. They entered the default of payment of interest in this case, and that on the first of *June*, 1818, the land was advertised to be sold on the third Tuesday of *September*, at two o'clock, at the court house in *Elizabethtown*, and that the premises were sold on that day, at public vendue, to the defendant, for the price stated. They omitted the copy of the advertisement, and the places at which it was set up, and the person who put it up. But there is no pretence that this omission was by design, nor does it appear to have been at all material, or of any injury to either of the parties concerned. I have assumed it as a conceded fact, that the notice, with a due description of the premises, was made and duly continued in the paper, and at the three public places in *Elizabethtown*, because no defect or omission of that kind is made a point on the part of the plaintiff; and the brief statement of the defendant, which had been previously furnished to the plaintiff, assumes that fact as conceded, and the one on the part of the plaintiff appears to me equally to assume it. But the entry of their proceedings in a proper book, was a requisition of the act, and it was the duty of the commissioners to have complied with it strictly. The object was to give more precision and certainty to every

1822.
KING
v.
STOW.

proceeding of the commissioners, and to provide checks against every kind of irregularity and fraud. But it cannot, for a moment, be supposed, that a single omission of any part of an entry required by the statute, will vacate the sale itself, as against a *bona fide* purchaser, who has no control over these entries, and which, as to those particulars which I have mentioned, are not required to be entered at any precise time. The act requires, that if any one of the commissioners is absent, they shall, *at their next meeting*, minute the cause of his absence, and they shall, *on the last day* of their first days of meeting for receiving moneys yearly, enter whose mortgages are foreclosed. But there is no particular time given for the entry of the advertisements, &c. and the proceedings at the sale must be entered, of course, after the sale has been had, and the title of the purchaser consummated. No doubt, the entry of the advertisements, and the places at which they were affixed, ought to be made as soon as may be after the act is done or directed, and the commissioners appear clearly to have been in default in this respect. But they are not parties to this suit, nor before me, for the purpose of defence or censure; and the only question is, whether the omission of the entry of the order for advertising, with the advertisement itself, be fatal to the subsequent sale. I conclude not; and to interfere with the sale on this ground, would be against principle and policy. The statute, with respect to these *memoranda*, was merely directory to the commissioners, and was not intended to affect the validity of their acts in respect to third persons; nothing can show this more clearly than an inspection of the contents of some of those entries which they were required to make. They were to enter the day of their meeting, place, hour, and the commissioners present; and if any one was absent, they were, at their next meeting, to minute the cause of his absence. They were, also, to enter the cause of all suits, and the information they had received, and of whom, at

length. This whole provision was nothing more than a direction to keep a very special journal of their proceedings, and it was intended for the benefit of the government, and to furnish a test of their fidelity. Any defect in their journal cannot destroy their sales. It is a principle of law, that the acts of commissioners *de facto*, who hold only by colour of title, and who have even omitted to take the oath of office, are valid when they concern the public, or the rights of third persons, who have an interest in the act done, and are void only as to such acts as are arbitrary and voluntary, and do not affect the public utility. This was the declared doctrine of the Supreme Court, in the case of *The People* v. *Collins*; (7 *Johns. Rep.* 549.) and the subject underwent a full and learned discussion by the Court of K. B. in the case of *The King* v. *Lisle*, (*Andrews' Rep.* 163.)

3. The last objection is, that the commissioners did not advertise in " three of the most public places of the county." They affixed up advertisements on the court-house door, and on the doors of two public inns, in the village of *Elizabethtown ;* and it is stated to have been the invariable practice of the commissioners, since their first appointment under the act of 1808, to publish their advertisements of sales of mortgaged premises, in the same places, and in no other manner; and they have sold, every year, more or less of the lands mortgaged to them, and lying in distant parts of the county. It is further admitted, that the village of *Elizabethtown* is the most public place in the county, and one of the most general resort, and far superior to *Catlin's Mills*, in the town of *Crown Point*, where the premises are situated, in population, number of buildings, wealth, and business, and, compared with which, *Catlin's Mills* is a place of little resort or notoriety. There were many other *more public* places in the county than *Catlin's Mills*, viz. the *village of Essex*, twenty miles north of the premises, and the upper falls of *Lake George*, fourteen miles southwest of the premises.

1822.

KING
v.
STOW.

It is very evident, from these facts, that the advertise-- ments were published with upright intention, and that the omission of *Catlin's Mills*, or other places, was not with any fraudulent design. The words of the act were lite- rally complied with; for the court-house door, and the two most public inns, in such a village as *Elizabethtown*, were three of the most public places in the county. They were undoubtedly so in point of fact; and if the legislature in- tended, by the word *places*, to mean towns or villages, they would have said so, and not left the commissioners, in every county, to perplex themselves, and others, with the interpretation, or various readings of the word " places." The court house was one of the most public places in the county, and the tavern of *Newell* was one of the most public places in the county, and so was the tavern of *Root;* and these were the three places selected by the commission- ers, and had been so invariably, since the institution of the board. The public had acquiesced in their construction of the words of the act. The law did not require the notice to be carried home to the very premises to be sold, nor even to the town in which they were situated. The com- missioners were not even bound to consult proximity of situation, unless so required by the greater notoriety of the place within the vicinity of the premises. I think it would be rather a forced construction of the words " three of the most public places," to insist, that they must be either so enlarged as to embrace three distinct villages or towns, or so confined as to admit notices to be affixed up in three different parts of one and the same building. The words must have a reasonable construction, so as to answer the intent. Place means locality, and is to be taken in a more restricted, or a more enlarged sense, according to the subject matter. If one village be pre-eminent above all the rest in the county, it may well be, that the notices, affixed up in three of the most public places in that village, would better fulfil the ends of the law, and spread more

1822.

KING
v.
STOW.

general information, than if only one of them was put up in that village, and the other two elsewhere. This is very much the case in the county of *Essex*, and so it would be in the counties of *Albany*, or *Schenectady*, or *Columbia*. In other counties, again, it would seem to be necessary to select different villages; as, for instance, in the counties of·*Suffolk*, *Queens*, or *Putnam*.

If, however, it were to be admitted, that, by a sound construction of the act, the words " three of the most public places in the county," meant places in three distinct towns or villages, and not two or more places in the same city, or town, or village; yet, I apprehend, that a mere error of judgment, in a matter of such doubtful construction, cannot vitiate the sale against a *bona fide* purchaser, for a valuable consideration, and especially as such purchaser was " not apprized of any irregularity or omissions, in the proceedings of the commissioners, if such there were." What was meant by the word place, was matter of opinion. In one sense of the word, and in respect to the topography and settlement of the county of *Essex*, perhaps, in a just and reasonable sense, the directions of the statute were complied with; and surely, a fair purchaser, under a fair and impartial sale, is not to be disturbed,·even if a wrong construction has been adopted by the commissioners in this case. It is matter of error in judgment, rather than of default, negligence, or irregularity, in point of fact. The case of *Weitzell* v. *Fry*, (4 *Dallas*, 218.) is much in point as to the effect of notice upon a *bona fide* purchaser, in a case free from fraud, and it shows, also, the destructive effects of fraud. There is no analogy between this case and that of *Denning* v. *Smith*, (3 *Johns. Ch. Rep.* 332.) on which the plaintiff seems to have placed much reliance. The commissioners, as well as the purchasers, were parties to that suit, and the commissioners were charged with fraud, and the circumstances of the case warranted the charge; and there was a gross defect in the notice, as well

1822.

KING
v.
STOW.

as fraud in the manner in which it was promulgated. Most of the lands sold, were omitted in two of the notices, and the purchaser was knowing to all the defects. The case, therefore, was decided on the ground of the fraud; and though the places selected for the notices were found fault with, it was in reference to the question then depending, and every circumstance which might not, in a fair and honest case, have been entitled to weight, was considered and brought into notice, as having a just bearing upon the inference of fraud. This Court may well be justified in setting aside a sale, on the ground of fraud, which vitiates every proceeding, yet not be warranted in interfering with a purchase fairly made, though accompanied with some irregularities in the proceedings, on the part of the commissioners.

Upon a view of all the circumstances of the case, I am of opinion, that the plaintiff is not entitled to set aside the sale, and that the bill ought to be dismissed.

Decree accordingly.