DENNING and others *against* SMITH and others.

*January* 22, Though by the *act authorizing the loan of moneys*, &c. (sess. 31. ch. 216) the
and *March* 9.   mortgagor, after a default of payment, loses all equity of redemption. and the
         *Commissioners* become seised of an absolute estate in the premises ; yet the
         Commissioners are *trustees* for the *People* to the amount of the mortgage
         debt and interest, and, for the *mortgagor*, in respect to the surplus ; and
         the mortgagor as well as the People, has a right to demand of the Commis-
         sioners a faithful execution of the *trust*.
         The notice of sale, according to the true construction of the act, must contin-
         ue to be *fixed up* at three public places, and be advertised in a public news-
         paper of the county, from eight days after the 4th *Tuesday* of *May*, to the
         third *Tuesday* of *September*, or the time of sale.
         And where, on a default of the mortgagor, the Commissioners caused the mort-
         gaged premises to be sold, without giving due public notice of the sale,
         pursuant to the act and under circumstances denoting fraud and collusion,
         on the part of one of the Commissioners, the sale was set aside, and the deed
         executed by the Commissioners ordered to be delivered up to be cancelled;
         and the proceedings in an action of ejectment brought by the purchaser, to
         be stayed by a perpetual injunction.

BILL, filed 22d of *September*, 1815, stating that the
plaintiff, *William Denning*, on the 6th of *February*, 1812,
obtained a judgment in the S. C. against *Henry Persen*,
on a bond conditioned for 777 dollars and 79 cents. That
*H. P.* and his two sons *A.* and *J.*, being indebted to the
plaintiff, *Joseph Klein*, in 400 dollars, gave him a mort-
gage on lot No. 11, and part of lot No. 14, containing 125
acres situate in *Cairo*, in *Greene*, county; and the mort-
gage was recorded the 13th of *February*, 1812. That *J.
K.* had also a judgment against them, docketed the 1st
of *February*, 1812, for one thousand dollars ; and he was
the assignee of another judgment against them, docketed
the 13th of *January*, 1812, for 750 dollars, in favour of *J.
De Witt.* Executions were issued on the judgment, in fa-
vour of *W. D.* and *J. K.*, by virtue of which the sheriff seised
and sold a parcel of land in *Cairo* belonging to *H. P.* and
also the lots and parcels above mentioned, and *W. D.* and
*J. K.* became the purchasers at the sheriff's sale, and re-

ceived a deed for the same from the sheriff, dated 22d of *April*, 1812. That on the 15th of *December*, 1813, *W. D.* and *J. K.* sold and conveyed to the other plaintiffs, *Moses Austin*, and *William Sturges*, the land so purchased at the sheriff's sale, for 3,500 dollars, and received from them mortgages to secure the purchase money. That on the 21st of *September*, 1814, it was discovered by the plaintiffs, for the first time, that *Henry Persen* had, on the 5th or 6th of *July*, 1808, mortgaged one of the lots of land so purchased by the plaintiffs, to two of the defendants, *Stoddard Smith*, and *Abraham Hallenbeck*, Commissioners for loaning moneys, in the county of *Greene*, under the act of the legislature, passed the 11th of *April*, 1808,* for securing the payment of *seventy-five* dollars, loaned by the said Commissisoners to *H. P.*

That by the 15th section of that act, it was declared, that if any borrower should neglect to pay yearly, on the first *Tuesday* in *May*, or within *twenty-two days* thereafter, the yearly interest due, the Commissioners should be seised of an absolute estate in the land mortgaged, and the mortgagor should be utterly precluded and barred of all equity of redemption. Yet, as well by the equity of the statute, as by the several provisions of it, in particular, the Commissioners are *trustees for the beneficial interest of the borrower and his assigns*, to whom they are directed to pay the surplus, after the mortgage moneys are deducted.

That by the 19th section of the act, it is declared, that if the mortgagor, his heirs, or assigns, should, at or before the sale of the Commissioners, pay the mortgage money, payable on the first *Tuesday* of *May* preceding, and the costs, the Commissioner shall accept thereof, and permit the owner, or his heirs or assigns, to take possession of the land, and hold it, until a further default. That by the 20th section of the act, the surplus money, if any, after paying the mortgage debt and costs, should be paid to the mortgagor, his heirs or assigns. That by the 17th section of the same act, the Commissioner are directed,

* *Webster's* ed. *L. N. Y.* vol. 5. p. 392. sess. 31. ch. 216.

1818.

DENNING
v.
SMITH.

within eight days after the last *Tuesday* of their attend-ance, aforesaid, yearly, to cause advertisements to be fixed up in, at least, *three of the most public places in the county*, and in one of the *public newspapers*, describing the quantity and situation of the lands, and giving notice that on the third *Tuesday* in *September*, they would be sold at the court house, at auction, &c. That by the 32d section of the act, on the last day of their meeting yearly, they are to enter whose mortgages are foreclosed, and the number and sums of them, and also enter the orders for, and co-pies of the advertisements, for sale, and places at which they are set up, and who set them up, and the names of the purchasers, and the prices, and to whom the overplus belongs.

That the plaintiffs, as assignees of the estate of *H. P.* in the land mortgaged, have an interest in the compliance of the Commissioners with these provisions of the act. That the value of the premises mortgaged by *H. P.* to the Commissioners was three thousand dollars. That the defendants, fraudulently, &c. and in order to devest the plaintiffs of their interest, by surprise, did not ad-vertise the said land according to the act, by the notice in-serted in the newspaper, called the *Catskill Recorder ;* that part of lot No. 14, as described in the notice, contained about *fifteen* acres; lot No. 11, which is not mentioned in the notice, contains about 110 acres. That the notice, among other things, stated, "one other tract of land in *Canton*, now *Cairo*, part of lot No. 14, containing 125 acres;" that the direction in writing by the defendant, *Smith*, to the printer, was to insert the notice in his paper for three weeks, and put an advertisement on the court house door, and he thought the inside the best, on account of damage. That in two other notices, the land was de-scribed, as follows: "One other tract of land situate in *Canton*, now *Cairo*, lot No. 11, and part of lot No. 14, near *Persen's* mills, containing 125 acres, mortgaged by

*Henry Persen*, 6th of *July* ;" and one of the said notices was directed to be put up on the back of the writing desk of *James M'Vickar*, in his store in *Coxsackie* ; and the other on the outside of the inner door of the house of *Abijah Reed*, in *Greenville*. That no other notices were given by the defendants. That at the premises mortgaged there was a toll bridge, grist and saw mills, a manufactory of cloth, and a distillery, and in the same town, a large village and church. That *Greenville* and *Coxsackie*, were remote from the premises. That the Commissioners conducted the sale in a secret and clandestine manner ; that the front door and windows of the court house were shut, and the front door locked. That only two persons were present beside the defendants. That it could not be discovered that any business was transacting in the court house, unless the door is open. That the Commissioners would not give any information to the two by-standers of the identity and situation of the lot ; that they bid only 340 dollars, and the same was struck off to the defendant, *William Judson*. That the Commissioners well knew the situation and value of the premises, and the defendant, *Judson*, attended the sale at their request ; that the said lot was put up for sale out of the order in which it was advertised ; that the Commissioners executed a deed for the lot to *Judson*, who has brought an action of ejectment against the plaintiff, *Sturges* which is now pending. Prayer for general relief, and for an injunction.

The defendants in their answer denied any knowledge of the debts of *H. P.* and his sons to the plaintiffs *W. D. & J. K.*, or of the judgments and mortgage, or the assignment to *W. D. & J. K.* or of the sale and deed of the sheriff, &c. or when the plaintiffs first knew of the mortgage to the Commissioners; but they averred that *J. K.* was informed of the mortgage long before the sale. They admitted the loan office mortgage of the 125 acres of land in *Cairo*, by *H. P.* to secure the payment of 75 dollars with inte-

1818.

DENNIGN
v.
SMITH.

rest. That the interest due in *May*, 1814, not being paid, the Commissioners waited the time allowed by the act, and gave the notice stated in the bill. That the notice on the inside of the court house door was more likely to be preserved, and as likely to be seen, as if it had been on the outside. That they did not know that there was any error or defect in the notice published in the newspaper, and that lot No. 11. was omitted by mistake. That the notice was put up in the two usual places, and in the usual manner; and they denied any secresy or collusion in the sale; that *A. Cook* and *J. Bellamy*, both bid at the sale. That they do not recollect whether the outer door of the court house was open or not; that several persons were present when the sale commenced; that they gave every information in their power, as to the lot, and the defendant *Smith* read from the book the description of the mortgaged premises. That the defendant *Judson*, did not attend the sale at the request of the Commissioners; that the sale was conducted in the usual manner; and they denied all collusion with *Judson*. They admitted the deed to him by the Commissioners, and that he had brought an action of ejectment against the plaintiff *S*.

Twelve witnesses were examined on the part of the plaintiffs, who proved the material facts charged in the bill; and the substance of their evidence is stated in the opinion of the court.

*January* 22.    The cause came on to be heard in *January* last.

*Van Buren*, (Attorney General) and *J. V. D. Scott*, for the plaintiffs.

*Van Vechten* and *Van Dyck*, for the defendants.

The case stood over for consideration to this day, when the following opinion was delivered.

*March* 9.    THE CHANCELLOR. 1. The first and most essential object of inquiry in this case is, how far the provisions of the statute have been disregarded or violated by the Com-

missioners in the sale in question. It will accordingly be necessary to examine all the circumstances of the notice and sale, to ascertain this matter of fact.

DENNING
v.
SMITH.

A tract of land in the town of *Cairo*, in *Greene* county, of the value of 3,000 dollars, and upwards, was mortgaged to the defendants, *Smith* and *Hallenbeck*, as Commissioners under the act of the 11th of *April* 1808, (sess. 31 ch. 216.) to secure the repayment of a loan of 75 dollars. The interest of 5 dollars, 25 cents, due thereon in *May*, 1814, being unpaid, the Commissioners, by reason of the default, became forthwith, according to the declaration and words of the act, "seised of an absolute, indefeasable estate in the lands, &c. to the uses in the act mentioned, and the mortgagor, his heirs and assigns, were utterly foreclosed and barred of all equity of redemption." They were directed in such case to sell. the lands on the third *Tuesday* in *September* following, at the court house of the county, and after retaining the principal and interest of the mortgage, and the costs, not exceeding 3 dollars, the remainder of the moneys, if any, were to be paid to the mortgagor, his heirs or assigns.

The sale was to be made in pursuance of public notice, and the Commisioners were directed, in case of such default, and within eight days after the 4th *Tuesday* in *May*, "to cause advertisements to be fixed up, at no less than three of the most public places of the county, describing the quantity and situation of the lands, and giving notice of the sale on the 3d *Tuesday* in *September*, by way of public vendue, to the highest bidder, and they were also to cause such notice to be given in, at least, one of the public newspapers in the county."

The seisin of the Commissioners, free and clear of the equity of redemption, was nevertheless, as public agents or *trustees* for the People of the state, to the amount of the

The commissioners of public loans under the act, (sess. 31. ch. 216.) are, in case of the default on the part of the mortgagor, whereby they became seized of the premises clear of the equity of redemption, *trustees* for the *people* to the amount due on the mortgage, and for the mortgagor, as to the surplus, in case of sale.

mortgage money, and for the mortgagor and his represen-
tatives, in respect to the surplus.   The right of the mortga-
gor, and his assigns, to the surplus moneys, notwithstanding
the statute bar of the equity of redemption, was explicit-
ly declared in the act; and the State and the mortgagor
were equally entitled to demand a due and faithful perform-
ance of the trust, with which the Commissioners were
thus clothed.

We must so construe the act as to give effect to all its
provisions.   The mortgagor, after the default, has no legal,
(9 *Johns. Rep.* 129. 14 *Johns. Rep.* 362.) and, probably, no
equitable title, which can be directly enforced, as against
the land itself.   But he has a valid and deep interest in
the execution of the Commissioners' *trust.*   The State has
no interest beyond the amount of their loan.   All the sur-
puls moneys belong to the mortgagor ; and we are not wil-
ling to presume such a fearful and lamentable defect of
justice as the case would present, if a mortgagor could
not call in question a fraudulent or irregular sale by which
he was deprived of his surplus.

Let us then recur to the proofs, to see in what manner
the directions of the statute were complied with.

One of the advertisements was fixed up in the village of
*Greenville,* about seven miles northerly from the lands, in
the store of *Abijah Reed,* and another was fixed up on the
back of the writing desk of *James M'Vickar,* standing
on the counter in his store at *Coxsackie,* about 15 miles
easterly from the lands.

The selection of these two places does not appear to have
been made under the exercise of a sound discretion, and,
when taken in connection with many other circumstances,
it forms a very material *item* in the mass of testimony,
going to impeach the impartiality and integrity of the sale.

The act required the notices to be put up in three " of
the most public places" in the county; the object,
doubtless, was to diffuse, as widely as possible, the know-

ledge of the sale, and of the cause, and the subject of it. The step was absolutely requisite in order to do justice to the parties concerned in the land, and in the moneys to arise from it; and it was a duty peculiarly pressing in this case, in respect to the mortgagor, considering the very great disproportion between the value of the pledge and the debt charged, and the general severity of the provision, foreclosing at once, upon default, all right and equity of redemption. The Commissioners were bound to use diligence and judgment in selecting the public places best calculated to bring the notice of sale home to the mortgagor, and to all who were most likely to enter into competition for the purchase.

But here the Commissioners selected two country stores, at a great distance from the land, while it is proved that the premises were adjoining a turnpike road, and had on and adjoining them, mills, factories, and a toll-bridge, which rendered them a place of great notoriety. It is also shown, that *Smith*, one of the Commissioners, had frequently passed by the land, and must have been acquainted with it. It is very extraordinary, that a place of such note as the land itself, should not have occurred to the Commissioners as very suitable for a notice. Or if the land should not have been deemed one of the most fit public places, the village of *Cairo*, which is within the distance of a mile and a half of the premises, was a place of great notoriety. It is at the junction of three turnpike roads, and has a number of stores and taverns, and is the most central village in the county, and where county business is transacted. Why omit such a village as this, so near the lands, and resort to distant places? I apprehend no sufficient reason can be assigned.

The third notice was directed to be up on the court house door. This place was, no doubt, judiciously selected. It is, in many instances, the place required by statute authority. Thus the notice of the sale of mortgaged

1818.

DENNING
v.
SMITH.

The *notice* of sale required by the act to be fixed up in *three public places*, means that they should be put up in those places best calculated to bring home the notice of sale to the mortgagor, and to all persons who are most likely to attend as purchasers.

1818.

DENNING
V.
SMITH.

premises by the mortgagee, under a power contained in the mortgage, and the notice given by insolvent debtors, must be fixed upon the outward door of the court house of the county; and the notice of the general election of Governor and Senators, is to be given by the sheriffs in the same way. In the very loan office act, under which the sale was made, the Commissioners were to fix up notice of their appointment, &c. at the court house. But there was a very peculiar direction given as to this notice. In the letter from the defendant *Smith* to *Croswell,* directing this notice to be put up on the court house door, he adds, " the inside, I think, is best on account of damage;" and it was, accordingly, affixed up on the inside of the door. There is no evidence in the case, of any damage having occurred in former cases, by putting the notice on the outside of the court house door; it is proved that notices are usually put up on the outside of the door, and we have no proof that they had ever before been put up on the inside. The proof in this case is, that notice on the inside of the door would not be visible when the door is open, (as it no doubt is on all public occasions,) because the door swings against a wall. This concern in a public officer about damage to the notice, and assigning it as a reason for departing, in *this particular case,* from the usual, and probably from the universal practice, is a very suspicious circumstance, and looks like premeditated wrong.

Tee act further directed that notice was also to be given, in at least one of the public newspapers in the county; and the notice in this case was directed to be published in the *Catskill Recorder,* for three weeks.

One objection to this notice was the limitation of it to three weeks.

The act does not prescribe, in express terms, the length of time the notices were to remain fixed up, or continued in the paper. It only declared *when* they were to be

given, viz. within eight days after the 4th *Tuesday* in *May*, and when the lands were to be sold, viz. the 3d *Tuesday* in *September*. But I think the true construction of the act is, that the notices fixed up in three public places, were to continue "fixed up" until the sale. In a subsequent paragraph of the act, when a new or resale of the lands is to be made, the act requires at least "six weeks notice" of the sale to be given, in the manner before directed. This more explanatory provision as to the continuance of the notice was necessary, because the time of first announcing the notice was not fixed, and it comes powerfully in aid of the construction given to the prior section. If the Commissioners might direct the notices to remain fixed up only three weeks, they might in the exercise of their discretion, limit the time to three days. The act left no discretion with them on this point. The time when the notices were first to be put up, and the time of sale being declared, there was no need of any further provision, as the notice was, doubtless, intended to occupy the intermediate time. In the absence of proof to the contrary, we might presume, that the notices fixed up in the three public places remained up until the sale, but we have certain proof that the newspaper notice was only for three weeks, by the express direction of *Smith.*

This notice ought to have been commensurate in point of time with the others.

The words of the act are, that the Commissioners shall also cause, "such notice" to be given, in at least one of the public newspapers; and it meant a notice that was to correspond, in description and duration, with the notices to be "fixed up" at the public places. If the Commissioners had a control over the duration of the newspaper notice, they had equally a control over its commencement, and it might have been deferred until the day of the sale. "Such notice," here meant the same notice with the others, in every material point, and the duration or length of the notice, is always the most material part of it.

*1818.*

DENNING
v.
SMITH.

The *notice* of sale, according to the true construction of the act, should be continued fixed up at three public places, and be published in a public newspaper in the county, from and after the expiration of eight days, from the fourth *Tuesday* of *May*, until the third *Tuesday* of *September*, or time of sale. *Three weeks* notice is not sufficient.

1818.

DENNING
v.
SMITH.

The notice must contain the name of the mortgagor and an accurate description of the quantity and situation of the land foreclosed, and to be sold.

Having stated the facts as to the time and place of the notice, we proceed next to examine the contents of the notice, as to the description of the land.

In the notices fixed up at *Greenville* and *Coxsackie*, the premises were described as being in *Cairo*, and as being "lot No. 11. and part of lot No. 14. near *Persen's* mills, containing 125 acres, mortgaged by *Henry Persen.*" In the other notice, on the court house door, and in the newspaper, the premises were described as a tract of land in *Cairo*, "part of lot No. 14. containing 125 acres." The name of the mortgagor was here omitted, and the lands in lot No. 11. omitted, which contained about 110 acres, while the lands in lot No. 14. were but 15 acres. The omission of the mortgagor's name and of the number of the lot in the advertisements in *Catskill*, where the agent of the owner under the mortgagor resided, was a most unfortunate circumstance, and is calculated exceedingly to increase our apprehensions. It was also an omission, fatal, in any view, to the legality of the notice. Indeed it appears from the testimony of *Samuel Haight*, the agent of the plaintiff *Denning*, that if he had discovered from the advertisement of the Commissioners in the newspaper, (and which paper he took,) that the lands mortgaged by *Henry Persen* were included, he would have satisfied the demand.

Upon such notices the sale was made. There were very few bidders attracted by the notice. The sale was made in the lower entry of the court house, while the front door and windows were shut; and when the Commissioners were asked for an account of the lands, by one of the solitary by-standers, they referred him to the loan office books, and gave no further explanation.

The lands in question were purchased by the defendant *Judson*, for about 340 dollars; and it appears, that he came that day from his house in *Coxsackie* to *Catskill*, and, probably, for the purpose of such a speculation.

2. All these circumstances combined, warrant the conclusion, that the Commissioners grossly departed from the letter and spirit of the act, in the advertisement and sale of the lands. Some subsequent circumstances were pressed upon the argument, as evidence of the disposition or design of the Commissioners, or one of them, in this transaction. But I forbear to enlarge on that point. The abuse of trust appears to me to have been too palpable to be denied, and too grievous to be endured. There was a want of due discretion in the selection of the public places, at which two of the advertisements were fixed up. There was an abuse of discretion in putting the notice on the inside of the court house door, where it would probably be concealed from the public; and it was so singular and extraordinary a precaution, as to afford an inference of unwarrantable and fraudulent views. There was a defective notice as to time, in being confined to three weeks, in the *Catskill Recorder*, and still more defective as to description, by totally omitting the mention of one entire lot, containing the most part of the lands that were sold. And, lastly, the sale itself was attended with singular circumstances, calculated to exclude observation and competition. There was, upon the whole, so manifest a violation of the intention and directions of the act, and so great an injury in consequence of it, has been inflicted upon such of the plaintiffs as were entitled to the surplus moneys, that I cannot bring myself to doubt of the right of the party to relief. The only difficulty consists in settling the mode and extent of the relief to be afforded. The sale must either be set aside as null and void, and an opportunity afforded to the plaintiffs to redeem, under the 19th section of the act, or the Commissioners must account for the difference between the price that the lands sold for, and their actual cash value at the time. To allow the sale to stand, and to afford no relief to the plaintiffs, would (as the evidence strikes me,) leave a stain on the justice of

*margin:*

1818.

DENNING
v.
SMITH.

If the commissioners abuse their *trust*, this court will afford relief either by setting aside the sale, and letting in the mortgagor to redeem, or directing the Commissioners to account for the difference between the sum for which the land was sold, and its real value at the time.

the country. Sales of real property by public officers of one description or another, have become so frequent, and have excited such active cupidity, and such a spirit of speculation, that there is very great danger of injustice, unless we support strictly the checks and guards provided by law against abuse.

I should have no difficulty, if that was the only alternative presented, to hold the Commissioners responsible for a breach of trust in the sale of the lands, and make them answer in damages. The case of *The Charitable Corporation* v. *Sutton*, (2 *Atk.* 400.) would fully justify me, in going to that extent. " I will never determine, said Lord *Hardwicke*, in that case, that a court of equity cannot lay hold of every breach of trust, let the person be guilty of it in a private or public capacity." But I think the more appropriate remedy in this case is, to declare the sale void. It was not a sale under a judgment, or decree of a court of justice, where the purchaser has a right to presume every thing to have been legally done. In *Lloyd* v. *Jones*, (9 *Vesey*, 37.) Lord *Eldon* seems to have been of opinion, that mere irregularity, without making out a case of fraud or collusion of some sort or other in the purchaser, was not sufficient to affect him. Lord *Redesdale*, in *Bennett* v. *Hamill*, (2 *Sch.* and *Lef.* 566.) adopted the same idea, but the doctrine was applied in both cases to irregularity in *a decree*, and those cases have no analogy to the present. Here was a special trust to be executed by the Commissioners of loans, for the benefit of the State, and of the party entitled to the surplus, and all their authority to sell was under the statute prescribing the mode. If the sale by the Commissioners would be valid, upon a short or defective notice, it would be valid without any notice; and this surely cannot be maintained. A special authority must be strictly pursued, and every purchaser is to be

A special authority must be strictly pursued, and a purchaser is presumed to know such authority, when it is given by a public statute; and if he purchases, where the authority is not pursued, it is at his peril.

presumed to know that special authority, in this case, for it is contained in the act; and if he purchases in a case in which that special authority was not pursued, he purchases at his peril. The notice, which omitted altogether lot No. 11, and which was put up under an extreme abuse of discretion, if not with a fraudulent design, on the inside of the court house, was before the eyes of the purchaser as he stood in the inside of the court house hall, and ignorance of the defect and irregularity cannot be pretended.

The most advisable and proper remedy for the case appears to be, to declare the sale void, and to order the deed to be delivered up and cancelled, and to continue the injunction of the action of ejectment. This will be reinstating the parties in their rights, as they stood prior to the sale.

The defendant *Judson,* does not put himself forward as a *bona fide* purchaser, without notice of any irregularity. He knew all that the Commissioners knew. He only joins with them in their general allegation, that "they did not know that there was any deficiency or error of description of any kind, in the notice published in the newspaper." But they do not say *when* they did not know of the defect. Did not *Judson* know of it before the sale? That he does not deny. Besides, the ignorance is confined to the *newspaper* notice; and it is proved that the same notice was affixed upon the inside of the court house door. If a purchaser wishes to rest his claim on the fact of being an innocent, *bona fide* purchaser, he must deny notice, even though it be not charged, and he must deny it positively, not evasively; he must even deny fully, and in the most precise terms, every circumstance from which notice could be inferred. ( *Cason* v. *Round, Prec. in Ch.* 226. *Brace* v. *Marlborough,* 2 *P. Wms.* 491. See also 1 *Johnson's Ch. Rep.* 302. and the cases there cited.)

1818.

DENNING
v.
SMITH.

I cannot entertain any doubt of the jurisdiction of the court being competent to afford the requisite relief. The jurisdiction is necessary to help the *cestui que trusts*, who have been defrauded or unduly deprived of the surplus moneys, which were to arise from a fair and regular sale. They were compelled to resort to this court, as they had no title at law, and the legal title rested in the Commissioners, free of the ordinary equity of redemption. They could not have made any defence at law; all their right was a claim to the surplus fund, on a sale within the statute; so far the. Commissioners were trustees for them; and in that view the plaintiffs have an equitable interest to be protected. To vindicate that equitable right, the plaintiffs were obliged to apply to this court; and I conclude, with entire conviction, that the sales by the Commissioners, to be valid, must be made in conformity with the act, and that they cannot dispense with any of its directions.

I shall accordingly, declare, that the sale in question was made without the due public notice required by law, and under circumstances denoting a fraudulent intent on the part of the defendant *Smith*, and that it be adjudged null and void ; and that the deed executed by the Commissioners to the defendant *Judson*, be delivered up and cancelled ; and that the action of ejectment in the bill mentioned be perpetually enjoined; and that the defendants, *Smith* and *Hallenbeck*, pay to the plaintiffs their costs of suit, to be taxed.

Decree accordingly.