# TOWLE *v.* LEAVITT.

By-bidding or secret puffing at auction sales, is against public policy and illegal ; and will render the sale void, as against the owner of the property.

The highest real bidder at an auction sale is entitled to the property.

If the owner of property set up at auction, desires to have any restrictions upon the right of the highest bidder to take the property, it should be stated in the conditions of sale. This can be done by putting the property up at a certain price, or by the owner reserving one bid to himself.

If an agency is known, and is special, or if the circumstances connected with it, are such as should put a party dealing with the agent on enquiry, it becomes the duty of the person so dealing with the agent, to enquire into the nature and extent of the authority conferred by the principal, and to deal with the agent accordingly.

A special agent, authorized to sell in the usual manner, a specific piece of property, will exceed his authority if he sells the same at auction ; and the purchaser at the auction, knowing the property to be that of the principal, or the circumstances being such as should put him on enquiry, will not be protected in his purchase, against the principal.

Where A., left his carriage with B., a carriage maker, to be repaired, and directed him to sell the same if he had an opportunity, and at the same time B.'s

property was under attachment, and advertised for sale, and subsequently B.'s property was sold, and after the sale, B. directed the auctioneer to set up the carriage of A., and he did, and C. bid it off — *held*, that the circumstances were such as should put C. on enquiry, and that he could not hold the property, as against A.

An agent who sells the property of his principal wrongfully, is a competent witness for the principal; for the balance of his interest is against the principal. He is liable to the principal for the value of the property only, but to the purchaser he is liable as vender, and warrantor also.

REPLEVIN, for a phæton, of the value of fifty dollars. The defendant pleaded property in himself, and the plaintiff replied that the property was his, and not the defendants.

The evidence tended to show that the plaintiff, being the owner of the phæton, agreed with one Lane, a carriage-maker, to make some repairs upon it, and if he had an opportunity, to sell it; and directed him to sell it for forty-five dollars if he could get it, if not, to take forty dollars; that the five dollars should make no difference. Nothing was said to him of a sale at auction. Lane testified, that he had no authority to sell it for less than forty dollars.

Lane's property, consisting of carriages, was then under attachment, and advertised to be sold at auction by consent of parties. At the close of the sale, Lane directed the auctioneer to set up the carriage in question, which was done, and the defendant bid upon it. Lane at the same time employed a person to bid upon the phæton, with instructions not to suffer it to be sold under forty dollars. The carriage was struck off at seventeen dollars, and the auctioneer declared it sold at that price to Leavitt the defendant, and it was so entered by the clerk of the sale upon his account of sales. Soon after this, the defendant paid the clerk, who had the charge of collecting the bills, that price and took a receipted bill of the phæton, and at the first convenient opportunity, took possession of the carriage without any special delivery.

The person employed by Lane to bid upon the carriage, testified, that he bid seventeen dollars, and heard no other person bid that sum; that when he heard the carriage struck off at his bid, he left the place to attend to business of his own, without

noticing to whom the sale was declared by the auctioneer to be made, and that he supposed the sale to be made to himself. The principal dispute was, whether the person employed by Lane, or the defendant was the highest bidder.

A witness testified that some time before this sale, the plaintiff talked to him about repairing the phæton, and said that he had a notion of shoving it into some auction. The testimony of Lane, and also of Ricker, the person employed by Lane to bid at the auction, was objected to, because of their interest, but was admitted, subject to the opinion of the court.

The court charged the jury, that though the defendant was a *bonâ fidé* bidder at the auction, upon the phæton, yet if Ricker made a higher bid upon it, as a bidder for the owner, and the property was struck off and declared by the auctioneer to be sold to the defendant, the bid of Ricker would prevent the defendant from acquiring title by his bid; that the defendant would not acquire title, unless he was in fact the highest bidder; that though the defendant and Ricker both bid the same sum upon the property, and the auctioneer did not notice Ricker's bid, and declared the property sold to the defendant, and the same was entered to the defendant in the record of the sale, and no objection was made thereto, because Ricker supposed it struck off to himself, and the defendant paid for the property, yet he acquired no title to it by such bid, unless he was in fact the highest bidder. That Towle having authorized Lane to sell the carriage for forty-five dollars, if he could get it, if not, to sell it for forty dollars, and not for less, Lane had no authority to sell it in any manner, for less than forty dollars, unless the limitation was designed to be kept secret, and not to be disclosed by the agent upon an inquiry by the purchaser; that unless special injunctions of secrecy were given by Towle, to Lane, or unless they were satisfied that it was so understood between Towle and Lane, by the circumstances appearing in the evidence, or by the nature of the limitation, that it was not to be disclosed, Lane's authority was limited by it, and he could not give a title unless the price paid was forty dollars; that the highest bidder alone, could be the purchaser, and although he were a by-bidder, an actual *bonâ fidé* bidder of a lower sum, could take no title.

The counsel for the defendant requested the court to instruct the jury, that if the carriage went into the auction with the assent of Towle, and was struck off to Leavitt by the auctioneer for a sum less than forty dollars, the title of Leavitt was perfected upon payment of the sum bid, notwithstanding the plaintiff instructed his agent to have it bid up to forty dollars, and not to permit it to be sold for a less sum, unless the carriage was set up at the sum of forty dollars, or notice given that it would not be sold for a less sum. That if the plaintiff authorized Lane to sell the carriage for forty dollars, but to get forty-five if he could, but not to sell it unless he could get forty dollars, still Lane was the plaintiff's agent to sell, and might sell for less than forty dollars, and transfer to the purchaser a good title. That if the jury believed that the carriage went into the auction with the knowledge or assent of Towle, and was struck off to Leavitt for seventeen dollars, the title rested in Leavitt, on payment of the price, although Towle told Lane to sell it for forty-five dollars, if he could get it, if not for forty dollars.

But the court did not so instruct the jury, but told them that if the carriage went into the auction directly from Towle, and not through the intervention of Lane, and the defendant was the highest bidder in fact, the title rested in him, at whatever price.

The jury returned a verdict for the plaintiff, which the defendant moved to set aside, by reason of supposed errors in the rulings of the court, and the instructions given to the jury.

*Wood*, and *J. S. Wells*, for the defendant.

1. Lane and Ricker, were both interested in the cause. Lane testified that he had no authority to sell the carriage for less than forty dollars, and that nothing was said to him of an auction sale. His interest then was to have Towle recover, and to save him from loss by violating his instructions. Paley on Agency, 4, 5. Nor is his interest balanced. He stands liable to Towle, if Leavitt recovers, for the value of the carriage, which the case finds to be fifty dollars. But if Towle recovers, then he would be liable to Leavitt as a warrantor of title, as he puts

himself in the position of owner, not having disclosed the name of his principal. He would be liable for the amount paid by Leavitt for the carriage, seventeen dollars and interest. Lane's interest then is not balanced. 13 N. H. Rep., 110 ; 12 N. H. Rep., 239.

If Leavitt recovers, then Ricker, being employed to bid after the carriage was put up, and ordered not to let it go under forty dollars, would be directly liable to Towle for his negligence in letting it go for less than that amount. But if Towle recovers, he would in no way be liable to Leavitt.

2. The defendant contends that it is the legal duty of every bidder at an auction sale, to see that his bid, if the highest, is correctly stated before the entry is made in the record of sales ; that if he omits so to do, and the auctioneer declares the bid to another, and it is so entered without any objection or claim of the higher bidder, it is a waiver of the bid, else confusion and fraud will result. Any one may recall his bid before struck down. 2 Kent's Com., 537 ; 3 Term Rep., 148. And a neglect to claim his bid when finally declared to another, and struck down to him, is equivalent to a recall.

But our strong position is, that Ricker's bid was void, and should not have availed against Leavitt, though claimed at the time. He was a by-bidder for the owner, and his bid was a fraud upon the defendant, and other *bonâ fidé* bidders at the auction. We contend that the doctrine of *Bexwell* v. *Christie*, Cowper's Rep., 395, is the true doctrine. The principle of that case is sustained by the following authorities : 2 Kent's Com., 537, 539 ; 6 Term Rep., 642 ; *Crowder* v. *Austin*, 3 Bing. Rep., 368 ; 6 Johns. Rep., 194 ; 3 Johns. Cases, 32 ; 4 Johns. Ch. Rep., 254 ; 4 Cowen's Rep., 717 ; 8 Johns. Rep., 444 ; 13 Johns. Rep., 112 ; 1 Story on Eq., 290.

If the bid of Ricker was void, it should be wholly disregarded ; for if it is permitted to operate to defeat the defendant's bid, it has the effect designed, viz : to prevent the sale of the property at a less price than that fixed by the owner or his agent.

If Towle knew, and did not object, or assented to Lane's put-

ting the carriage into the auction, it goes there with a silent restriction, not to let it go under forty dollars. The limitation would thus be fraudulent, and could not avail.

We contend further, that the court should have charged the jury, that if they believed the carriage went into the auction with Towle's assent, then he should be governed by the sale, and that the defendant took a good title.

3. The charge of the court was directly against the decision of the supreme court in *Hatch* v. *Taylor*, 10 N. H. Rep., 538. The court should have charged the jury, that from the nature of the limitation itself, it was designed to be kept secret. See also, *Bryant* v. *Moore*, 26 Maine Rep., 84.

*Marston*, for the plaintiff.

1. Lane was a special and temporary agent of the plaintiff, constituted for the particular purpose of repairing the plaintiff's carriage, and selling the same for a given price; and as such agent his power was limited, and he could not bind his principal by any act beyond his authority. He had no authority to sell the carriage at auction, and could give no title if he attempted to sell in any way for a less sum than forty dollars. Smith on Contracts, 245, 246; Story's Agency, §§ 126, 127, 132, and notes; *Mann* v. *Commission Co.*, 15 Johns. Rep., 44; *Andrews* v. *Kneeland*, 6 Cowen's Rep., 357; *Batty* v. *Carswell*, 2 Johns. Rep., 48; *Nickerson* v. *Hyserott*, 5 Johns. Rep., 58; *Gibson* v. *Colt*, 7 Johns. Rep., 390. An agent with limited authority, cannot exceed it; if he does, his principal will not be bound by it. *Snow* v. *Perry*, 9 Pick. Rep., 539. A party dealing with a special agent is bound to enquire, and ascertain the extent of his authority. Whoever deals with an agent constituted for a special purpose, deals at his peril when the agent passes the special limits of his authority. 2 Kent's Com., 620. And if an agent, to whom goods are entrusted for a particular purpose make a sale of the goods in a manner or to a person not within the scope of his authority, the principal may disaffirm the sale, and recover back the goods. *Peters* v. *Ballister*, 3 Pick. Rep., 495; *Com. Bank* v. *Kartwright*, 22 Wend. Rep., 348.

2. It is not a presumption of law, as the defendant contends, that the limitations upon the authority of the agent were to be kept secret and not to be disclosed on enquiry by a purchaser; but a question of fact, which the court very properly left to the jury, so that the case of *Hatch* v. *Taylor* has no application to the case at bar.

3. If Lane was interested at all, he was interested in the success of the defendant, and not in that of the plaintiff who prevailed in the suit, and who called him as a witness. The defendant's counsel contends, that Lane, if he exceeded his authority, is liable to Towle for the value of the carriage, and if Towle prevailed, that he is liable to Leavitt as warrantor of title. Be it so; and then he is clearly interested for the defendant, to whom he is liable, not only for the value of the carriage, but for the reasonable costs of the defendant attending the litigation, to determine the rights of property in the carriage. The case of *Kingsbury* v. *Smith,* 13 N. H. Rep., 110, settles that question.

4. Ricker had no interest whatever, in the event of the suit. If the defendant had prevailed, it would by no means have established the fact that Ricker had been guilty of any negligence. But supposing he had been guilty of negligence, which the case does not find, and of which there was no proof, his interest, if he had any, was altogether too remote and contingent, to disqualify him. An interest, to disqualify, must be a certain and direct interest, not a contingent or consequential one. He must gain or lose by the direct legal operation of the judgment, or the record must be evidence for or against him in some other action. 1 Greenl. on Ev., § 390 ; *Rex.* v. *Boston,* 4 East's. Rep., 581 ; *Ely* v. *Herward,* 7 Mass. Rep., 25. And further, if the defendant's position is correct, that all by-bidding is illegal, Ricker is of course not liable for neglecting to do an illegal act.

5. Ricker was employed by Lane, not for the purpose of enhancing the price, but merely to prevent a sale at an under value, as he lawfully might do. The point is expressly determined in *Smith* v. *Clark,* 12 Vesey, 477 ; also in *Brauley* v. *Alt,* 3 Vesey, 620. The same rule is also stated, in *Steele* v.

*Ellmaker*, 11 Searg. & Rawle., 821; 1 Sugden on Vendors and Purchasers, 22.

6. There was no evidence, and no pretence, that Towle assented to have the carriage sold at auction, or had any knowledge of it. He was absent from the State. The court could not be required to rule upon any supposed state of facts. *Reed* v. *Reed*, 3 Hawks, 5; *Churchill* v. *Rosebeck*, 15 Conn. Rep., 359.

EASTMAN, J. The first question presented in the instructions of the court to the jury, is one of importance, and, it is believed, somewhat new in the jurisprudence of this State. By-bidding, and puffing at auction, is a matter of very common occurrence, yet we do not now remember that the effect of it has ever been settled by our courts. Still the question is not by any means a new one, and has frequently been agitated in other jurisdictions.

The first case that we have been able to find in the books, is that of *Brown* v. *Nightengale*, 3 Brown's Parliamentary Cases, 263, decided in 1726. It was resolved in that case, by the House of Lords, that a puffer could not recover compensation for his services, since they were contrary to good faith. This does not appear to be often referred to, though the next in order of time has attracted much attention. *Bexwell* v. *Christie*, 1 Cowper's Rep., 395, decided by the King's Bench in 1776, may be regarded as the leading case upon the subject. That was an action against an auctioneer for selling a horse for less than the sum directed, fifteen pounds sterling, and the court held that it could not be maintained; for if the auctioneer had followed the directions he must have employed by-bidders, which would have been illegal. At the trial, Lord *Mansfield*, chief justice, said that the practice at auctions, of owners buying in their own goods, struck him as a fraud upon the public; and that the nature of these sales required that the goods should go to the best *real* bidder. On the case coming under review before the full bench, his lordship said: "the question then is, whether the owner can privately employ another person to bid for him? The basis of all dealings ought to be good faith; so more especially in these transac-

tions where the public are brought together upon a confidence that the articles set up to sale, will be disposed of to the highest real bidder. That could never be the case if the owner might secretly and privately enhance the price by a person employed for that purpose." And again, an owner of goods .set up to sale at an auction, never yet bid for himself. If such a practice were allowed no one would bid. It is a fraud upon the sale, and upon the public. The disallowing it, is no hardship upon the owner, for if he is unwilling that his goods should go at an under price, he could direct the auctioneer to state that they would be sold for such a price, and not lower. Such a direction would be fair. Or he might have it inserted in the conditions of sale, that he himself might bid once in the course of the sale. Such a condition would be fair, because the public are then apprised, and know upon what terms they bid. In Holland it is the practice to bid downwards." All of the court concurred in the opinion of the chief justice.

The next case that we find, is that of *Howard* v. *Castle*, 6 Term Rep., 642, decided in 1796. It was there held, that if an owner of goods or an estate put up to sale at an auction, employ puffers to bid for him without declaring it, it is a fraud on the real bidders, and the highest bidder cannot be compelled to complete the contract. Lord *Kenyon*, C. J., in delivering his opinion, freely endorses the doctrine of *Bexwell* v. *Christie*, and adds, that the whole of the reasoning employed in that case is founded on the noblest principles of morality and justice, principles that are calculated to preserve honesty between man and man. The other members of the court concurred in the opinion expressed by the chief justice.

Following the English common law cases in the order of time, we next find *Crowder* v. *Austin*, 3 Bingham's Rep. 368, decided in 1826, where the principles of the previous cases were discussed and adopted.

In *Wheeler* v. *Collier*, 1 Moody & Watkins, Rep., 123, which was a case at *nisi prius*, Lord Tenterden, chief justice, said: " if the owner of an estate put up for sale by auction, employ a person to bid for him, the sale is void, although only one such

person be employed and although he is only to bid up to a certain sum ; unless it is announced at the time that there is a person bidding for the owner."

In the exchequer the same rule prevails. *Rex* v. *Marsh*, 3 Younge & Jervis, Rep., 331 ; *Thornett* v. *Haines*, 15 Meeson & Welsby's Rep., 367. In the last case, which was decided in 1846, it was held that the deposit with the auctioneer might be recovered back by the vendee in an action of assumpsit. All the cases, both in law and equity, were examined, and the conclusion of the court was, that the doctrine of Lords *Mansfield*, *Kenyon* and *Tenterden*, as stated in the preceding cases, should be adopted.

In the United States the decisions are not so uniform, though the weight of authority is in favor of the same rule. In *Baham* v. *Bache*, 13 Louisiana Rep., 287, it was held that the owner of property may withdraw it before the highest bid is accepted by the auctioneer, but he has no right to bid himself, unless he publicly reserves this right ; still less can he bid through the auctioneer. So where the price of property was limited, which fact was not communicated to the bidders, and the auctioneer advanced on the bid until it reached the limits prescribed by the owner, and was adjudicated to the defendant, it was held that the sale was null and void as to the purchaser. The action was brought to compel the purchaser to comply with the terms of the sale, and he had judgment. In delivering the opinion of the court, *Eustis*, Justice, adopts the principles of *Bexwell* v. *Christie*, and remarks : " the decision in that case, has not been followed in all cases, but we apprehend that time and scrutiny will reëstablish its force wherever the principles of law, and public morals are co-incident." He further remarks : " we are aware it is the general usage to conduct sales at auction in this manner, but it is a usage, which we can neither justify nor recognise in the administration of justice. It is equally repugnant to public policy, and to that fairness which ought to exist, and which people have a right to expect, in a sale of property avowedly offered to the highest bidder." To the same effect is *Correjolles* v. *Mossy*, 2 Louisiana Rep., 507.

VOL. XXIII.              47

There are several other cases sustaining collaterally the same views, although the precise point was not decided — among them are, *Phippen* v. *Stickney*, 3 Met. Rep., 384 ; *Wilbur* v. *Howe*, 8 Johns. Rep., 444 ; *Thompson* v. *Davis*, 13 Johns. Rep., 112 ; *Hawley* v. *Cramer*, 4 Cowen's Rep., 717 ; *Gulick* v. *Ward*, 5 Halstead's Rep., 87 ; *Dudley* v. *Little*, 2 Haw. Rep., 505.

But in *Steele & al.* v. *Ellmaker*, 11 Serg. & Rawle., 86, it was held, that if goods are sent to auction, with directions to the auctioneer to dispose of them at a certain average advance in the invoice price, and he sell them for less than the limited price, an action may be maintained against him for the difference between the limited price, and that for which the goods were sold. This is a departure to some extent from the English common law doctrine ; and the learned judge, *Tilghman*, in commenting upon the doctrine of Lord *Mansfield*, observes, that perhaps the tone of Lord *Mansfield's* morality, was too lofty for the common transaction of business. His honor, however, admits, in discussing the question, " that the most proper way would be, to declare publicly, that the goods were not to go under a limited price, or that the owner reserved the right of a bid for himself." Among the decisions at common law, this is the only case that we have met with, where the rule of the entire cases has been directly departed from.

In equity, however, the common law rule in England has been to some extent relaxed, as will be seen by reference to the cases of *Bramley* v. *Alt*, 3 Vesey's Rep., 620 ; *Conally* v. *Parsons*, 3 Vesey, 625, n. ; *Smith* v. *Clarke*, 12 Vesey, 477, and *Woodward* v. *Miller*, 2 Collier's Rep., 279. Both the first, and last case, went upon the ground that these were *bonâ fide* bids, made by real bidders after the puffers had ceased bidding, and in the last case it seems to be admitted, that at common law, a different rule prevails from that held in the courts of equity. The doctrine of these cases appears to be this, that if upon a view of all the circumstances, the court are satisfied that any fraud was intended or practised, they will hold the sale void ; but if the puffer was employed, and the bidding made for the purpose of preventing a sacrifice of the property, it will be otherwise.

In this country, the rule in equity is perhaps not well settled. *Story*, in his Equity Jurisprudence, vol. 1, § 293, lays down this as the rule : " If under bidders or puffers are employed at an auction, to enhance the price and deceive other bidders, and they are in fact misled, the sale will be held void, as against public policy." And in *Veazie* v. *Williams*, 3 Story's C. C. Rep., 611, the same learned judge, states the rule in equity to be this: " Where all the bidders, except the purchaser, are by-bidders, secretly employed by the seller, and the judgment of the purchaser is improperly influenced by their bids, the sale is a fraud, against which equity will relieve the purchaser. But when there are real bidders as well as sham bidders, and the last bid before the purchaser's, is a real bid, and the judgment of the real bidders and the purchaser, has not been blinded by the sham bidders, the sale is valid." In regard to this case it is to be remarked that Judge *Ware*, the district judge, dissented from the doctrine of Judge *Story*, and in an able opinion adhered to the rule of the early common law decisions.

In the case of the *National Fire Ins. Co.* v. *Loomis*, 11 Page's Chan. Rep., 431, the point was alluded to, and in such a manner as to leave the impression that the learned Chancellor ( *Walworth*,) recognized the principles of *Bexwell* v. *Christie*, as the correct rule. And in *Latham's Ex'rs* v. *Morrow*, 6 B. Monroe's Rep., 630, the question is distinctly left open for future adjudication.

We have thus referred to the principal cases bearing upon the question, both in law and equity, and we will close our citations with the observations of Chancellor *Kent*, who, having reviewed all the cases, both in law and equity, remarks : " The original doctrine of the King's Bench is the more just and salutary doctrine. In sound policy, no person ought, in any case, to be employed secretly to bid for the owner against the *bonâ fide* bidder at a public auction. It is a fraud in law on the very face of the transaction; and the owner's interference and right to bid, ought to be intimated in the conditions of sale." 2 Kent's Com., 539. And after the best consideration which we have been able to give the subject, it appears to us, that this is the true doctrine,

and that sound morals and good faith between man and man, evidently require that by-bidding should receive no countenance from any legal tribunal. Fair, open-handed honesty ought to pervade all dealings, and all parties should, so far as may be, meet upon equal terms in their bargains and sales. Combinations to prevent bidding are held, both at law and equity, to be fraudulent, and why should not any secret employment to effect bidding, be viewed in the same light? If it be said that the property may be sacrificed for the want of bidders, as is declared in some of the cases in equity; the answer is that the owner may withdraw it before the sale commences, or he may set it up at a specified sum, or he may announce that he will reserve the right to make one bid himself. If an auctioneer receive property with directions not to sell under such a price, he should so state on setting it up, or he should reserve one bid to himself. The owner of the property has no right to complain at such a course, because it is the only course that comports with the truth. If those who wish to have their property sold at auction are not willing that it should be done in a fair, open and honorable way, they must seek other ways of disposing of it.

The line of distinction which is attempted to be drawn in equity between a fair and fraudulent sale, where secret puffing, or by-bidding is resorted to, appears to us to be difficult to trace. We think it will be far better to discard the distinction entirely, and thereby close the door to all temptation to fraud in auction sales, and the perjury that would be very likely to follow. The whole and real truth should be stated when the property is offered for sale.

Upon this point of the case, the instructions of the court must be held to be erroneous.

The questions connected with the agency of Lane, which are presented by the case, are more intricate than the one already considered, and it has not been without some difficulty that the court have arrived at a conclusion in regard to them.

Upon the facts reported, it does not appear that Leavitt knew that the carriage had ever belonged to the plaintiff. This however would be material, only as making it, or not, necessary for

Leavitt to enquire into the nature of Lane's agency in selling the property. If an agency be known, and it is special, it is the duty of the party who deals with the agent, to enquire into the nature and extent of the authority conferred by the principal, and to deal with the agent accordingly. *Snow* v. *Perry*, 9 Pick. Rep., 542; Story on Agency, § 133; *Deming* v. *Smith*, 3 Johns. Ch. Rep., 344; *Schimmelpenic* v. *Bayard*, 1 Peters' Rep., 264, 290; *Hatch* v. *Taylor*, 10 N. H. Rep., 547.

But where the agency is not known, and the principal has clothed the agent with powers calculated to induce innocent third persons to believe that the agent owned the property or had power to sell, the principal is bound, and strangers will not suffer. Story on Agency, § 93. In like manner, an implied authority may be deduced from the nature and circumstances of the particular act done by the principal. If the principal sends his commodity to a place where it is the ordinary business of the person to whom it is confided to sell, it will be intended that the commodity is sent thither for the purpose of sale. And where an article is sent in such a way, and to such a place, as to exhibit an apparent purpose of sale, the principal will be bound, and the purchaser will be safe, although the agent may have acted wrongfully, and against his orders or duty, if the purchaser has no knowledge of it. Story on Agency, § 94; Paley on Agency, 167; 2 Kent's Com., 621; *Pickering* v. *Busk*, 15 East's Rep., 38; *Saltus* v. *Everett*, 15 Wendell's Rep., 267; *Dyer* v. *Pearson*, 3 Barn. & Cres., 42; *Hern* v. *Nichols*, 1 Salk. Rep., 288; *Sanford* v. *Handy*, 23 Wendell's Rep., 260.

Lane was a carriage-maker. His business was to make and sell carriages, and also to repair them when brought to his shop for that purpose, as was the case with this carriage of Towle. If Lane's sole business had been to make and sell carriages, the deposit of the one in question with him, might come within the principle of the preceding cases; but such was not the fact; and a purchaser would have no such right to presume that a second-hand carriage in Lane's possession was his, as would protect him from the claim of a *bonâ fide* owner. It is to be observed too, that this carriage was set up and sold, after the property of

Lane, which had been previously attached and advertised, was disposed of by the officer. The case does not so state in terms, but probably it was well known to Leavitt and others present, that the carriage belonged to Towle. But, however that may have been, we think that the situation of the property was such, taken in connection with Lane's circumstances, and the attachment and advertisement of his property, as to put a purchaser upon enquiry.

Assuming that Leavitt knew that Lane was acting as the special agent of Towle, in selling the property, or proceeding upon the ground that the property was so situated as to put a purchaser upon enquiry, the question arises, whether the private instructions given by Towle to Leavitt, not to sell the carriage under forty dollars, were in the nature of a limitation to his authority, or were instructions not to be disclosed.

The acts of a general agent, known as such, govern his principal in all matters coming within the proper and legitimate scope of the business to be transacted, although he violates by these acts his private instructions ; for his authority cannot be limited by any private instructions, unless known to the person dealing with him. *Whitehead* v. *Tuckett*, 15 East's Rep., 400 ; *Lightboy* v. *N. A. Insurance Co.*, 23 Wendell's Rep., 22 ; *Lobdell* v· *Baker*, 1 Met. Rep., 202 ; 2 Kent's Com., 620 ; *Allen* v. *Ogden*, 1 Wash. C. C. Rep., 174 ; Story on Agency, § 126 ; Paley on Agency, 200 ; *Penn* v. *Harrison*, 3 Term Rep., 757 ; *Mann* v. *Commission Co.*, 15 Johns. Rep., 44.

With regard to a special agent, the law appears to be equally well settled, by the authorities above quoted, that he if exceeds the authority given, his acts will not bind his principal. But it is to be observed, that a distinction is to be taken between the limited authority of a special agent, one appointed for a specific purpose to do certain and specified acts, and the private instructions given to such agent. Where the authority is limited in a *bonâ fidé* manner, and the limitation is to be disclosed by the agent, and is disclosed either with or without enquiry, any departure from such authority or instructions, will not bind the principal; but where the authority or instructions given, are in the

Towle *v.* Leavitt.

nature of private instructions, and so designed to be, they will not be binding upon the parties dealing with the agent. And if the instructions are of such a nature that they would not be communicated if an enquiry was made, (even though it be the duty of the person dealing with the agent to make the enquiry,) it is not necessary that it should be made, for it would not be communicated if made. *Hatch* v. *Taylor*, 10 N. H. Rep., 538; *Bryant* v. *Moore*, 26 Maine Rep., 84. Upon this view of the question, it would seem that the directions not to sell the carriage for less than forty dollars, would be in the nature of private instructions. The fact does not seem to us to have been intended to be communicated. This, however, may admit of some doubt, and were the case to turn upon this point, a more minute examination would perhaps be necessary.

But it appears to the court, that there is one point that must settle the case for the plaintiff. This carriage was sold at auction; and this we think must be regarded as exceeding any authority or instructions given, that could bind the plaintiff. The defendant, knowing the property to be the plaintiff's, or if he did not know it, the situation of the property being such as to render it incumbent on him to make all necessary enquiries, was bound, on seeing it exposed to sale in an unusual manner, to enquire as to the right of Lane thus to sell it. Had he done this, probably all difficulty would have been avoided; and whether the directions not to sell for less than forty dollars, be considered as a limitation upon the agent's authority or as private instructions, nothing was said about Lane's selling at auction, and no enquiries made in regard to it. A sale at auction implies a sale at any price that may be offered. It is ordinarily the last resort to reduce property into money, and we should be slow to ratify the doings of an agent clothed with the usual powers to sell, who should pursue such a course.

Had there been any evidence that Towle authorized Lane to sell the carriage at auction, so that the question could have been properly submitted to the jury, this obstacle in the defendant's case might perhaps have been overcome; but we find nothing that would warrant the court in giving the instructions desired

in this respect.   A court cannot be required to instruct the jury upon any supposed state of facts.

The sale then, must be held void, and as a necessary consequence the defendant has no right to the property, and cannot sustain his defence, notwithstanding there may have been error in some of the rulings made against him.

It is unnecessary to comment further upon the questions raised in the case.   We will remark, however, that Lane was a competent witness.   The balance of his interest was against the party calling him.   The statement in the case that the phæton was of the value of fifty dollars is evidently incidental and the mere allegation of the writ.   There is no proof that it was of that value.   The case of *Kingsbury* v. *Smith*, 13 N. H. Rep., 110, settles the question.

*Judgment on the Verdict.*