March 21, 1876. NIXON *v.* BROWN.

*Agent—Estoppel by principal to deny authority to sell.*

The plaintiff employed one M. to buy a horse for him. M. bought the horse, paying for it with the plaintiff's money, and took a bill of sale in his own name. Afterwards he informed the plaintiff of what he had done, and showed him the bill of sale; but the plaintiff permitted him to go away with the horse and bill of sale still in his possession. M. thereupon went to the defendant, who had no knowledge of the agency, showed him the bill of sale, sold him the horse for cash, and absconded. *Held,* that the plaintiff could not recover in an action of trover for the horse.

FROM GRAFTON CIRCUIT COURT.

TROVER, for a horse. The action was sent to a referee, who reported that he found the defendant not guilty, &c., and that he recover against the plaintiff his costs. He also reported the following facts, on the basis of which he held that the plaintiff could not recover.

"In May, 1874, one Charles Mason, who resided in Whitefield, N. H., purchased the horse in question of one Hubbard, who resided in Dalton, N. H., for the plaintiff, who furnished, the money ($95.00) to Mason to pay for the same. Mason did not disclose to Hubbard that he was purchasing for the plaintiff, but, on the contrary, gave Hubbard to understand that he was acting for himself, and took a bill of sale of the horse from Hubbard to himself. Afterwards Mason informed the plaintiff that he had made the purchase, and showed him the bill of sale, and told him he could give him a bill of sale, and that would

make it all right, but did not do so; and it was then arranged that Mason should bring the horse to the plaintiff on the following Monday—this being on Saturday ; and it was further arranged that Mason, after he had brought the horse to the plaintiff, should take him and keep him, and drive him to better break him. Mason never brought the horse to the plaintiff, but on Tuesday—having previous to said Saturday showed the horse to the defendant, who was then stopping at Whitefield, and represented to the defendant, that he, Mason, owned him—he showed the defendant the bill of sale from Hubbard, and finally sold the horse to the defendant, and received in payment $75.00, and then left for parts unknown. There was a sufficient demand before suit."

At this September term, 1875, both parties moved for judgment on the report, and the court ordered judgment for the plaintiff, to which the defendant excepted, and tendered this bill of exceptions, which was allowed by FOSTER, C. J., C. C.

*Carpenter*, for the plaintiff.

*Blair & Burleigh*, for the defendant.

LADD, J. I am of opinion that the defendant's exceptions in this case must be sustained, and that judgment should be entered in his favor upon the report of the referee. The general rule, that the possession of goods by a bailee, or servant, gives him no power to make any disposition of them, except by virtue of actual authority received from the owner (PERLEY, J., in *Folsom* v. *Batchelder*, 22 N. H. 51), is so well settled as to be quite elementary. But there are several exceptions to this rule, quite as well settled, and quite as well understood as the rule itself. *One relates to money, bank bills, checks, and notes payable to the bearer, or transferable by delivery. The cases establishing this exception, commencing, perhaps, with *Miller* v. *Race*, 1 Burr. 452, are very numerous, and quite uniform. *Another exception, in England, relates to sales in market overt. But as we have no markets overt in this state (*Bryant* v. *Whitcher*, 52 N. H. 158), that exception has no existence here. *Another is where the possession of the bailee, from the nature of his employment, implies an authority to sell,—as, when goods are left with an auctioneer, or factor, a sale by such bailee, though he had no actual authority, will bind the owner. PERLEY, J., in *Folsom* v. *Batchelder*, *supra*, p. 51, and cases cited. The reason given for this last exception is, that the owner has allowed the bailee in possession to hold out the appearance of an authority to sell, which would deceive and defraud the fair purchaser if the law allowed the validity of the sale to be questioned. This statement of the reason, thus clearly and succinctly given by the late Chief Justice PERLEY, suggests the ground of my decision in this case. The facts, specially stated by the referee, show most clearly to my mind that the plaintiff allowed Mason, while he retained possession of the horse, to hold out the appearance

of ownership in himself, and so of an authority to sell, which would deceive and defraud a fair purchaser if the law permitted the validity of the sale to be questioned.

The plaintiff's counsel undertakes to avoid the application of this just and wholesome rule by saying that the taking of the bill of sale by Mason in his own name was not the plaintiff's act; and this is true. Mason bought the horse for the plaintiff, and paid for it with the plaintiff's money. Why he concealed the fact of his agency from Hubbard, and why he took a bill of sale in his own name instead of that of his principal, does not appear; but inasmuch as this was all contrary to the truth of the transaction, it is fair to presume that it was part of the scheme of fraud which he then had it in his mind to perpetrate. So far there was certainly no act of the plaintiff, and nothing to prevent the application of the general rule, which Chancellor Kent says is a maxim alike of the civil and common law, that *nemo plus juris in alium transferre potest quam ipse habet.*  2 Kent's Com. 324.

But the report states, that after the purchase "Mason informed the plaintiff that he had made the purchase, and showed him the bill of sale, and told him he could give him a bill of sale, and that would make it all right, but did not do so; and it was then arranged that Mason should bring the horse to the plaintiff on the following Monday—this being on Saturday; and it was further arranged that Mason, after he had brought the horse to the plaintiff, should take him and keep him, and drive him to better break him," &c.  What was the meaning of this talk about Mason giving the plaintiff a bill of sale of his own horse?  Why did he not hand over the bill of sale he took from Hubbard?  True, it is not expressly stated by the referee that the plaintiff assented to this proposal of Mason, which if it had been carried out would have left Mason with the highest evidence of ownership still in his possession.  But the inference is irresistible that he did assent to it, at least so far as to permit Mason to go away with Hubbard's bill of sale, having the horse still in his possession.  Why did not the plaintiff take from his agent either the bill of sale or the horse?  Counsel say he could not do it, perhaps, without a breach of the peace.  Did he make the effort?  That does not appear.  Suppose he had demanded the bill of sale, and his agent had refused to give it up to him, would he have suspected then that there was anything unusual or wrong in Mason's conduct?  If Mason had refused, upon demand, to give up either the horse or this evidence of title in himself, what was there to hinder the plaintiff from taking the animal upon a writ of replevin in the detinet, under our present statute?  A refusal by Mason to hand over both the horse and the bill of sale upon demand, would amount to a conversion in law, and would in fact be evidence of the most conclusive character that he intended to appropriate the animal to his own use, regardless of the plaintiff's rights.

Even if the plaintiff's suspicions were not aroused by the extraordinary circumstance that Mason had taken the bill of sale in his own name, a demand of this sort would either have disarmed his agent of

the power to deceive and defraud innocent purchasers, or would have developed a purpose to appropriate the property, which would call for immediate action by the plaintiff to secure himself, as against the rapacity of a thief. Why did the plaintiff suffer Mason to go away with the bill of sale and the horse both in his hands ? No answer to this question appears in the case, and no answer at all sufficient to my mind has been suggested in the argument. That act of the plaintiff was, as it seems to me, little if at all less significant than if he had himself executed a bill of sale of the horse, and delivered it to Mason along with the animal. At any rate, I see no just reason why, so far as regards the rights of an innocent purchaser, it should not be followed by the same legal consequences.

At the argument Mr. Carpenter put this supposed case :—A, having sold his horse to B, delivers the animal, together with a bill of sale running to B, to his servant or agent, to be carried to the vendee. But the servant on the way, finding a customer for the horse, produces the bill of sale, represents himself to be the person there named as purchaser, and sells the horse to an innocent third person. Of course there could be no question of the right of the owner to recover his property, under that state of facts, against such innocent purchaser. The cases covering this point are numerous, of which *Saltus* v. *Everett*, 20 Wend. 267, is a good example. In that case it was held that the purchaser of part of a cargo of a vessel was not protected against the claims of the real owner, although the purchase was made under a bill of lading, regular and fair on its face,—it appearing on the trial of the cause that the master of the vessel, in which the goods were originally shipped, had *fraudulently*, at an intermediate port, transshipped the goods into another vessel, and procured a bill of lading in his own name, which he transferred to his agents, the vendors.

If the plaintiff had not been informed of the fact that Mason had taken a bill of sale of the horse in his own name, and with that knowledge permitted him to go forth clothed with all the indicia of ownership, and so completely armed for the commission of a fraud, the case supposed in argument, and that class of cases of which *Saltus* v. *Everett* has been referred to as the type, might have application. As it is, I think they do not apply at all. I regard this act, or omission, if it should be called an omission, of the plaintiff as decisive of the case, and I am therefore of opinion that there should be judgment on the report for the defendant.

CUSHING, C. J. The case, as I understand it, finds substantially that the plaintiff permitted his agent, Mason, to have possession of the horse, with the indicia of ownership. Undoubtedly, if Mason, merely having possession of the horse by the plaintiff's consent, had sold him, the maxim *caveat emptor* would be held to apply, and the buyer would be bound to see to it that his vendor had a good title. But such was not this case. Here, by the plaintiff's permission, Mason not only had possession of the horse, but also had a bill of sale showing that the title

was in him. Mason had been enabled to get this evidence of title to himself by the misplaced confidence of the plaintiff in entrusting him with the money to make the purchase; and when he showed the plaintiff the bill of sale made to him, the plaintiff made no objection, and, as the case finds, arranged with him to keep the horse awhile longer in his own possession.

The case of *Pickering* v. *Busk*, 15 East. 38, is a leading case, and nearly if not exactly in point. In that case Swallow, a broker, had purchased for the plaintiff, Pickering, a quantity of hemp, which by the plaintiff's desire was delivered to Swallow by a transfer to him in the books of the wharfinger. Shortly after, another lot of hemp was purchased by Swallow, which was transferred to the name of Pickering, or Swallow, which the court held to be the same as if it had been transferred to the name of Swallow. The plaintiff paid for the hemp. Swallow afterward sold the hemp to Haywood & Co., who paid him for it. The plaintiff sued the assignees in bankruptcy of Haywood & Co. in trover for the hemp. It was held that the plaintiff, having given to Swallow all the indicia of ownership, could not afterwards be permitted to say that Swallow had not authority to sell the hemp.

In the case of *M'Neil* v. *The Tenth National Bank*, 46 N. Y. 345 (S. C., 7 Am. Rep. 341), it was held that "When the owner of bank shares delivered to his brokers, to secure a balance of account, the certificate of the shares, indorsed with blank assignment, an irrevocable power of transfer signed and sealed by himself, and the brokers, without his knowledge, pledge the shares with other securities for advances, one who paid the advances at the broker's request, and in good faith received from them the certificate of the shares and the other securities, was entitled to hold the shares as against the owner for the full amount of the advances remaining unpaid after the other securities were exhausted."

RAPALLO, J., in his opinion, says,—" It must be conceded that, as a general rule applicable to property other than negotiable securities, the vendor, or pledgor, can convey no greater right or title than he has. But this is a truism, predicable of a simple transfer from one party to another, where no other element intervenes. It does not interfere with the well established principle, that, where the true owner holds out another, or allows him to appear as the owner of, or as having full power of disposition over the property, and innocent third parties are led into dealing with such apparent owner, they will be protected. Their rights in such cases do not depend upon the actual title or authority of the party with whom they deal directly, but are derived from the act of the real owner, which precludes him from disputing, as against them, the existence of the title or power which, through negligence or mistaken confidence, he caused or allowed to appear to be vested in the party making the conveyance." He cites the following cases: *Pickering* v. *Busk*, 15 East. 38; *Gregg* v. *Wells*, 10 Adol. & El. 90; *Saltus* v. *Everett*, 20 Wend. 267, 284; *Mowrey* v. *Walsh*, 8 Cow. 238; *Root* v. *French*, 13 Wend. 570. In *Moore* v. *Metropolitan National*

*Bank*, 55 N. Y. 41 (S. C., 14 Am. Rep. 173), the same doctrine is applied to the case of a purchaser of a *chose in action*.

As I can place no other construction upon the referee's report than that it finds in this case that the horse and the evidence of title remained in Mason's possession with the plaintiff's consent, I think these authorities, as well as those cited by my brother LADD, abundantly show that the plaintiff is estopped to deny that Mason had authority to sell the horse, and that therefore the exceptions must be allowed.

SMITH, J. It is clear that Mason had no authority whatever from Nixon to sell his horse. The only question is, whether the plaintiff left the property in the possession of Mason under circumstances from which the law will infer that he had authority to sell. When the owner of a chattel has by his own conduct enabled his agent to hold himself forth to the world as having not the possession only, but the property, or the right to sell,—that is, when the real owner of goods suffers another to have possession of his property, and of those documents which are the indicia of property,—a sale by such person will bind the true owner. *Dyer* v. *Pearson*, 3 B. & C. 43. The same principle is laid down in this state, as follows : " When the purchaser knows he is dealing with an agent, it is his duty to inquire into the nature and extent of the authority conferred by the principal, and to deal with the agent accordingly. But when the agency is not known, and the principal has clothed the agent with powers calculated to induce innocent third persons to believe that the agent owned the property, or had power to sell, the principal is bound, and strangers will not suffer." *Towle* v. *Leavitt*, 23 N. H. 373.

In *Barnard* v. *Campbell*, 55 N. Y. 456, the rule is thus stated : " Two things must concur to create an estoppel by which an owner may be deprived of his property, by the act of a third person, without his assent, under the rule now considered. (1) The owner must clothe the person assuming to dispose of the property with the apparent title to or authority to dispose of it ; and (2) the person alleging the estoppel must have acted and parted with value upon the faith of such apparent ownership or authority, so that he will be the loser if the appearances to which he trusted are not real. In this respect it does not differ from other estoppels *in pais*."

It would be easy to multiply authorities to this point ;—they are numerous, and are believed to be all one way. Indeed, the principle is quite elementary, " that where one of two innocent parties must suffer by the fraud of a third person, he who has trusted such third person, and enabled him to deceive the other, is to abide the consequences of the fraud, however innocent he may be in other respects." Story on Agency, sec. 127.

Now apply these rules to the facts in this case. Nixon constituted Mason his agent to purchase for him of one Hubbard a horse, and intrusted him with the sum of $95 for that purpose. Mason fraudulently represented himself to Hubbard as purchasing on his own account, and

took a bill of sale to himself. Mason afterwards informed the plaintiff that he had made the purchase, showed him the bill of sale, and told him he could give him a bill of sale which would make it all right; and promised to bring the horse to him on the following day. Nixon did not ask him for the bill of sale, nor make any attempt to induce Mason to surrender it, but suffered him to depart with it in his possession. Instead of bringing the horse to Mason on the following day (Monday) as he had promised, Mason, on Tuesday, took him to the defendant, representing that he owned him, showed him the bill of sale, and sold him the horse for $75, and with the money left for parts unknown.

It is claimed by the plaintiff that Brown, the defendant, did not buy the horse relying upon the bill of sale from Hubbard to Mason that the horse was Mason's. The answer to this is, (1) it does not appear that he did not rely upon it; and (2) the only inference we can draw from the facts found is, that Mason's purpose in showing it was to satisfy Brown that his claim to own the horse was true, and Brown, upon seeing it, must have been satisfied that it was evidence of Mason's claim to the ownership.

It is unnecessary to inquire whether Brown was put upon inquiry, for it is manifest that if he had inquired of Hubbard, the only person to whom any of the facts pointed as able to give further information, he would have learned no additional particulars. The whole trouble with the plaintiff's claim is that he suffered his agent to carry off with him the evidence as to the ownership of the horse, which was directly calculated to mislead and deceive an innocent purchaser. He selected as an agent a person who proved to be a thief. And inasmuch as one of two innocent persons must suffer, it must in this case be the plaintiff, because he put it in the power of his agent to deceive the defendant when it was possible for him to have prevented it. The defendant is entitled to judgment on the report.

*Exceptions sustained.*