WEISS–LAWRENCE, INC.

v.

JAMES TALCOTT, INC.

v.

Charles E. LAWRENCE and Seth J. Weiss a/k/a Ted Weiss.

Civ. A. No. 74–212.

United States District Court, D. New Hampshire.

Aug. 1, 1975.

Harold D. Moran, Fisher, Parsons, Moran & Temple, Dover, N. H., for plaintiff.

Eaton W. Tarbell, Jr., Sulloway, Hollis, Godfrey & Soden, Concord, N. H., for defendant.

## OPINION AND RULING

BOWNES, District Judge.

This is a ruling upon a motion by defendant James Talcott, Inc. ("Talcott") for summary judgment on both counts of a complaint brought by the plaintiff, Weiss-Lawrence, Inc. ("Weiss-Lawrence"). The complaint alleges negligent and false representation and abuse of process or some variation thereof. The motion for summary judgment is granted.

## FACTS

*Count I*

Count I is an action for negligent and false representation. Plaintiff claims that defendant negligently and falsely represented the credit worthiness of a third-party. The factual background based on the record and viewing all questionable assertions in the light most favorable to the plaintiff follows.

The parties to this action entered into a financing agreement dated October 23, 1970 ("Agreement"), which essentially provided Talcott with the option of "factoring" certain accounts receivable of Weiss-Lawrence at a 15% discount and a security interest in the accounts receivable. Under the Agreement, Talcott was to decide whether or not each account receivable was "eligible" for factoring. (Agreement at ¶ 2) The Agreement also provided Talcott with a security interest in all factored accounts receivables "whether now existing or hereafter arising or in which we [Weiss-Lawrence] now have or may hereafter acquire any rights." (Agreement at ¶ 1)

In late March or early April, 1972, Roger S. Brooks, comptroller of plaintiff, had a telephone conversation with Richard P. Gagnon, a commercial loan officer of Talcott, regarding a loan against accounts receivable of Spaulding Shoe Company ("Spaulding"). This was, according to Brooks, the first communication between the parties concerning Spaulding. (Brooks Dep. at 11)

As a result of his conversation with Gagnon, Brooks understood that Talcott would treat the Spaulding account as eligible within the sense of the Agreement up to $5,000 initially, then to $20,000 after Weiss-Lawrence had enough experience with Spaulding to evaluate its credit worth. (*Ibid.*)

Subsequently, the plaintiff credited Spaulding with an amount in excess of $100,000, all of which was financed in turn by Talcott. (Lawrence Dep. at 79)

In addition to the April, 1972, Brooks-Gagnon telephone conversation, Lawrence telephoned Gagnon on the later occasions when plaintiff wanted to expand the loan base. (Lawrence An-

swers to Interrogatories) In expanding the loan base to $20,000, Lawrence stated that Gagnon advised him to watch the Spaulding account carefully. (*Ibid.*) Gagnon further warned Lawrence that accounts receivable outstanding more than ninety days "regardless if it's a AAA or Z account" would not be deemed eligible. (Lawrence Dep. at 89) In April or May, 1973, Gagnon sent plaintiff a copy of a Dunn & Bradstreet report of Spaulding based on November 30, 1970 financial figures. (Lawrence Dep. at 85)

That report indicated at a glance that between November 30, 1968 and November 30, 1970 Spaulding's net worth declined 50% from approximately $600,000 to approximately $400,000, and its profits from $40,000 to nil. The Dunn & Bradstreet summary stated that Spaulding's condition was "good" and its trend "steady."

Talcott made no other statements, either by word or by deed, concerning Spaulding to Weiss-Lawrence. (Brooks Dep. at 24; Lawrence Dep. at 93)

The plaintiff admits that it never asked Talcott why it was willing to lend 85% of $20,000 (Lawrence Dep. at 89); nor did it ask Talcott to guarantee Spaulding's accounts receivable. (Lawrence Dep. at 98) There seems no question that the plaintiff initiated requests to include Spaulding in the loan base.

Weiss-Lawrence sales to Spaulding for the period in question total $205,994.05. Of that amount, Spaulding paid Weiss-Lawrence $162,075.63, which included $7,731.26 for returned shoes. Weiss-Lawrence's first sale to Spaulding occurred on April 3, 1972, following approximately four months of negotiations. (Lawrence Dep. at 79)

It is the plaintiff's position that the defendant's behavior when considered in the light of all the circumstances was tantamount to a representation that Spaulding was credit worthy; that this representation was false and had been negligently made; that the plaintiff relied on the representation and suffered as a consequence thereof. The defendant denies having made a representation with respect to Spaulding's credit worthiness and further states that, if a representation is found, that the plaintiff was contributorily negligent for relying thereon without further investigation of its own.

## Count II

Count II is:

In a plea of the case for that on or about October 23, 1970 the Plaintiff entered into a financing agreement with the Defendant whereby the Defendant agreed to advance maney [sic] to the Plaintiff on the security of certain accounts receivable of the Plaintiff, and other assets of the Plaintiff, to be assigned to the Defendant; the Plaintiff complied with the terms of said agreement but the Defendant wrongfully, negligently and contrary to the terms of said agreement withheld certain funds belonging to the Plaintiff; failed to account to the Plaintiff for certain sums of money and other assets belonging to the Plaintiff; charged excessive fees, contrary to the terms of said agreement, to the Plaintiff; converted to its own use certain monies and assets of the Plaintiff; and provided false and inaccurate credit information to the Plaintiff; causing loss of money, loss of business, and damage to its credit reputation to the Plaintiff; all to the damage of the Plaintiff, as it says, in the sum of Two Hundred Thousand ($200,000) Dollars.

At first glance, this Count appears to be a repetition of Count I couched in different language. However, in light of the plaintiff's pretrial memorandum and a general policy of liberally construing pleadings, I interpret this Count, with one exception,[1] as a claim that Tal-

---

1. The language "and provided false and inaccurate credit information to the Plaintiff" obviously belongs in the Count I claim of negligent and false representation.

88

cott "recklessly and wrongfully persisted [during the course of the bankruptcy proceedings] in its claim for the J. C. Penney money and thereby unwarrantedly jeopardized the very existence of Weiss-Lawrence." (Plaintiff's Final Pretrial Report at Memorandum of Law (e))

On December 5, 1973, the plaintiff filed a petition with the bankruptcy court requesting an arrangement under Chapter XI of the Bankruptcy Act. On December 10, 1973, the defendant filed an application to reclaim a check in the approximate amount of $135,000 issued by J. C. Penney ("the J. C. Penney check") on or about December 6, 1973, in payment of an account receivable due the plaintiff. The defendant also moved for a preliminary injunction restraining the plaintiff from dealing in any way with the J. C. Penney check pending resolution of defendant's claim to it.

On December 21, 1973, the bankruptcy court heard arguments directed to whether or not the J. C. Penney check was upon a receivable and, as such, fell within the Agreement.

While finding that the Agreement included the J. C. Penney check, the bankruptcy court refrained from issuing an injunction, because it was of the opinion that Talcott would be repaid otherwise within a matter of days, which it was. In any event, plaintiff had expended approximately $90,000 of the $135,000 J. C. Penney check to meet its payroll.

Also heard on December 21, 1973, were Weiss-Lawrence's requests that Talcott release all liens against the plaintiff, as well as abate its charge for legal fees in the amount of $4,566.72. These fees were incurred in connection with services rendered in connection with the bankruptcy proceedings.

The court found that the request for release of Talcott liens had become moot, but that attorneys' fees were excessive to the extent of $1,250 and ordered that this amount be refunded.

The ultimate orders from the bankruptcy judge in connection with all the matters argued at the December 21, 1973 hearings were rendered on March 7, 1975, and appeals by Weiss-Lawrence therefrom were filed on March 27.

## ISSUES

1. Did Talcott have a duty to exercise due care in the investigation of facts underlying any representations it made to Weiss-Lawrence respecting Spaulding?

2. If such a duty could be found, then did Talcott make representations to Weiss-Lawrence respecting Spaulding?

3. In petitioning the bankruptcy court for the proceeds of the J. C. Penney check and an injunction prohibiting anyone else from receiving these monies, did Talcott either abuse the bankruptcy process, or prosecute maliciously, or interfere with some prospective commercial advantage of Weiss-Lawrence?

## ANALYSIS AND RULING

I.  *Negligent Misrepresentation*

The law in New Hampshire regarding negligent misrepresentation is not completely lucid. This is not surprising in view of its lineage, which is mixed and includes among its ancestors the doctrines of fraud, gross negligence and equitable estoppel. *See, Marshall v. Pierce*, 12 N.H. 127 (1841); *Lord v. Colley*, 6 N.H. 99 (1833); *Runlet v. Otis*, 2 N.H. 167 (1820).

Currently, New Hampshire recognizes negligent misrepresentation, but a careful reading of the cases indicates that it is applied only after a common sense analysis of the relationship between the parties.

The courts of this State have not been extravagant in imposing obligations not to misrepresent negligently. In each case, the duty running between declarant and buyer, if any is found, is apparent from all the circumstances. These circumstances fall into two lines of cases. The first line is characterized by a representation, intent to have reliance, and damages. The second line has the

elements of the first plus a financial interest of the declarant in having the other party rely.

Typical of the first line of cases is *Thompson v. Sanborn*, 11 N.H. 201 (1840). The action was in trover for a yoke of oxen. The defendant had purchased the oxen from a third-party after the plaintiff endorsed a statement "that he did not own a hair upon the cattle." (11 N.H. 202) The court found that not only did plaintiff "own a hair upon the cattle," but also the remainder of the beast. It further found that the plaintiff knew he owned the cattle, and having that knowledge, allowed the defendant to follow through with the purchase.

In consequence of these findings, the court estopped the plaintiff from asserting his title and undoing the sale. Other cases of this pattern include *Allen v. Shaw*, 61 N.H. 95 (1881); *Nixon v. Brown*, 57 N.H. 34 (1876); *Stevens v. Dennett*, 51 N.H. 324 (1871); *Richardson v. Chickering*, 41 N.H. 380 (1860); *Wells v. Pierce*, 27 N.H. 503 (1853); *Runlet v. Otis*, 2 N.H. 167 (1820).

As in *Thompson v. Sanborn, supra*, in none of these cases was it found that the declarant received some financial benefit from his misrepresentations. Nevertheless, courts did find a duty not to misrepresent. As one court stated, quoting from an earlier decision, recognizing the earlier title and undoing the sale after wilful misrepresentation "cannot consist with the honor of the law, or with the wisdom of the administration of justice, that the fraud should remain triumphant." *Thompson v. Sanborn, supra*, 11 N.H. 206.

Typical of the second line of cases in which the financial interest of the defendant is apparent is *Cunningham v. Co.*, 74 N.H. 435, 69 A. 120 (1908). There, it was found that a tradesman who falsely represented that stove polish sold by him could be safely used upon a hot stove had a duty to know the truth of that representation.

In imposing this duty, the court found that the representation "was made for the purpose of inducing [the customer] to change his position." (74 N.H. 437)

In *Maxwell Ice Co. v. Brackett, Shaw & Lunt Co.*, 80 N.H. 236, 116 A. 34 (1921), a seller of ice cream machines made representations regarding one of these machines that were subsequently belied by its performance.

Citing *Cunningham v. Co., supra*, the court applied the rule that false representations made for the purpose of inducing a change of position are tortious. (80 N.H. 239, 116 A. 34)

The court also appears to have considered the inequality of knowledge among the parties. "It is the duty of one who volunteers information to another not having equal knowledge, with the intention that he will act upon it, to exercise reasonable care to verify the truth of his statements before making them." (80 N.H. 238, 116 A. 35)

In *Garapedian, Inc. v. Anderson*, 92 N.H. 390, 31 A.2d 371 (1943), defendant gave misstatements regarding a rug buyer to a rug seller. Specifically, the defendant wrote:

"I can say unqualifiedly that you will be justified in relying on his word for any commitment he makes." (92 N.H. 392, 31 A.2d 372)

Preliminary to any determination, the court noted that: "[t]he defendant's conduct is said to be wrongful only when it contravenes some duty which the law attaches to the relation of the parties . . . ." (92 N.H. 393, 31 A.2d 373)

Assessing defendant's conduct, the court observed that:

"The misstatements in the present instance were not made for the purpose of inducing the plaintiff to enter into any transaction in which the defendant had a financial interest." (92 N.H. 394, 31 A.2d 373);

"The defendant obtained nothing of value from the plaintiff . . . ." (*Ibid.*); and

The plaintiff was "thoroughly familiar with credit reports and the conventional method of securing them,

yet he failed 'to utilize obvious means of checking up' the accuracy of the defendant's statements." (92 N.H. 395, 31 A.2d 374)

The court found that the defendant had no duty to provide plaintiff with accurate information and that the defendant's representations must be considered mere opinions. Accordingly, it ruled for the defendant.[2]

The consistency of the judicial approach towards determining either the existence or the absence of a duty in such circumstances was most recently displayed in *Eno Brick Co. v. Barber-Greene Co.*, 109 N.H. 156, 245 A.2d 545 (1968). This action arose out of representations made by a manufacturer with respect to his machine that mixed clay with water.

In finding the defendant manufacturer had a duty to ensure the accuracy of his representations, the court observed that:

> [T]he statements were made by experts on a matter requiring peculiar skill or knowledge to one not having equal knowledge, for the purpose of inducing the plaintiff to enter into a transaction in which the defendant had a financial interest. Under such circumstances, a statement of opinion may be the basis of an action. (109 N.H. 158, 245 A.2d 547)

The second line of cases, then, have the following elements:

1. a (mis)statement
2. by one regarding his goods
3. and having superior knowledge of these goods
4. given to induce a change of position with respect to the goods
5. followed by reliance.

If the court finds all these elements, then a duty will be imposed to exercise due care with respect to the investigation of the facts underlying a representation. In the absence of due care, the last inquiry of whether or not the defendant was contributorily negligent will be made. *Cunningham v. Co.*, *supra*.[3]

In approaching the case at hand, it is apparent that it does not fall within the first line of cases, because it involves some financial interest of the declarant. The question thus becomes whether the facts are such that the law would permit a reasonable man to find that Talcott had a duty to provide Weiss-Lawrence with accurate information regarding Spaulding's credit worthiness. Only if such a duty is found, does one look to consider whether or not a representation was made.

*Cunningham v. Co.*, *supra*, *Maxwell Ice Co. v. Brackett, Shaw, et al*, *supra*, and *Eno Brick Co. v. Barber-Greene Co.*, *supra*, were instances where affirmative

---

2. For a similar case in an earlier era, see, *Lord v. Colley*, 6 N.H. 99 (1833).

3. There are cases that do not fit neatly into either line of cases. One of these is *Conway Bank v. Pease*, 76 N.H. 319, 82 A. 1068 (1912). This was an action in assumpsit to recover an amount due upon a promissory note, purportedly endorsed by the defendant. In fact, the signature was forged, and the court found that defendant had knowledge of its forgery, but did not tell the bank. The court hinted that the defendant did not timely tell the bank of the forgery for fear that it would interfere with the maturing of a mortgage in his favor against the maker of the note.

The court ruled that the defendant was estopped from interjecting the forgery, because his "active intervention" resulted in damage to the plaintiff bank. (76 N.H. at 323, 82 A. 1068) This case can follow either the first or the second line of cases. It is an estoppel case turning on the failure of one party to advise another of its rightful title. Yet, the court's reference to the coincidence between defendant's delay in advising of forgery and the maturation of his mortgage against the maker of the promissory note cannot be considered gratuitous. Therefore, the court must have believed the defendant had a financial interest in not reporting the forgery.

Thus the facts in *Conway Bank v. Pease* justified the imposition of a duty by reason either of general equity principles or of the more traditional fraud notion.

representations were given respecting goods sold by the defendants.

That information was given with respect to each manufacturer's own product was, in my view, the critical element that infiltrated the other factors considered by the courts and controlled the directions of their decisions.

The technical nature of the subject matter, which was in the seller's province, of the statements prevented them from being considered "mere puffing" and simultaneously compelled the inference that a representation of quality was given. The same technical character evinced the inequality of information between buyers and sellers and prevented contributory negligence from entering the picture. The fact that the representation was given with respect to the declarant's own product implied most strongly that there was an intent to induce the buyer to purchase.

Here, no information was given regarding Talcott's product, credit. As no information was given with respect to Talcott's product, Talcott's financial interest was not implicated as financial interests were implicated in the decided cases. By analogy, had the seller of ice cream machines in *Maxwell Ice Co., supra*, told its buyer only that the machines could be paid by the seller with money obtained from finance company X, the seller would not have a financial interest in the financing such that it would be liable for negligent misrepresentation in the event that finance company X were to default on any of its obligations.

It would not be fair or reflective of common sense to impose upon one in the defendant's position the duty to use due care in assessing the credit worthiness of customers of the plaintiff. To impose such a duty would make one in Talcott's position an insurer of companies like Weiss-Lawrence. No such duty attaches to the relationship of these parties. *See, Garapedian v. Anderson, supra*, 92 N.H. 393, 31 A.2d 371. Such a duty would turn the contractual rela-

tionship between companies like Weiss-Lawrence and Talcott topsy-turvy, for in reality, Weiss-Lawrence insures Talcott against Spaulding and companies like it. Weiss-Lawrence does so by subjecting all its accounts receivable to Talcott's security interest and by accepting loans up to only 85% of these accounts receivable. Further, between the two parties, Weiss-Lawrence has the expert knowledge concerning companies in its field and had that knowledge at the time of the Weiss-Lawrence-Spaulding contract. (Brooks Dep. at 13)

Finally, one in Talcott's position could not possibly administer credit checks on the myriad of companies dealing with its customers. Indeed, Talcott must rely on Weiss-Lawrence's representations that Spaulding is reliable and uses its 15% margin between loans and accounts receivable and blanket security interest as protection in the event Weiss-Lawrence's representations prove wrong.

█ Even if a duty existed, no reasonable mind could find that Talcott made any representations respecting the credit worthiness of Spaulding. Talcott neither made any affirmative statements regarding the quality of Spaulding, nor provided Weiss-Lawrence with data so technical and so peculiarly within the grasp of Talcott that reasonable minds could infer that an implicit representation had been made.

In the light of the precedents and in consideration of all the circumstances, I rule that the law does not impose a duty upon Talcott to exercise due care in giving representations concerning companies in the position of Spaulding to its clients, specifically Weiss-Lawrence. I further find that if such a duty did exist, then no representation within the common law meaning of negligent misrepresentation was made in the instant case and this conclusion would apply to any fraud allegation.

## II. *Abuse of Bankruptcy Proceedings*

Plaintiff's second cause of action lies essentially either in the theories of mali-

cious prosecution and abuse of process, or conceivably in intentional interference with some prospective economic advantage.

More specifically, plaintiff claims that by requesting that the bankruptcy court enjoin Weiss-Lawrence from using the J. C. Penney check and turning the proceeds of the check over to defendant, Talcott used the bankruptcy process purposely to harm the plaintiff's prospects for reorganization under the Act.

## A. Malicious Prosecution and Abuse of Process

█ A malicious prosecution is "one that is begun in malice, without probable cause to believe it can succeed, and which finally ends in failure." *MacRae v. Brant*, 108 N.H. 177, 230 A.2d 753 (1967); *accord, Perley v. Roberts*, 138 F.2d 518 (1st Cir.), *cert. denied* 321 U. S. 788, 64 S.Ct. 786, 88 L.Ed. 1078 (1943); *Ferry v. Ferry*, 94 N.H. 395, 54 A.2d 151 (1947); *Cohn v. Saidel*, 71 N. H. 558, 53 A. 800 (1902); *Davis v. Clough*, 8 N.H. 157 (1835).

█ The plaintiff has the burden of proving that the defendant acted without probable cause of success and maliciously. (*MacRae, supra*, 108 N.H. 180, 230 A.2d 755)

█ Abuse of process, as defined by *Restatement (Second) of Torts* § 682 (Tent. Draft 13 April 27, 1967), is defined as follows:

> One who uses a legal process, whether criminal or civil, against another to accomplish a purpose for which it is not designed is liable to the other for the pecuniary loss created thereby.

This definition is substantially in line with New Hampshire law. *See, Friel v. Plumer*, 69 N.H. 498, 43 A. 618 (1898), where an attachment proceeding against exempt items was initiated "quite as much by anger and spite against the plaintiff as by a desire to collect their debt." (*Id.* at 499, 43 A. at 618)

█ It is distinguished from malicious prosecution in its concern for the misapplication of the procedure regardless of which party won in the underlying action. Prosser, *Law of Torts,* § 115, p. 876 (1964).

## B. Interference with Prospective Economic Advantage

█ Although the law is sparse in this area, New Hampshire does recognize tortious conduct for the unprivileged interference with prospective economic gain. *Huskie v. Griffin*, 75 N.H. 345, 74 A. 595 (1909).

█ As a rule, cases of this type involve either contractual or employment relations. However, it is, I think, appropriate to make an educated guess that the tort would embrace the larger area of general business interests. *See,* Prosser, *supra* at § 124. This tort, which Prosser titles, "Interference With Prospective Advantage," requires the presence of a number of elements, two of which are likelihood that the plaintiff would have gotten what he claims and a basis for estimating what he has lost. Prosser, *supra* at § 124, pp. 974–75.

Plaintiff cannot succeed on any of the foregoing causes of actions.

█ Malicious prosecution is inapplicable. Weiss-Lawrence did not prevail at the bankruptcy hearing. Although Talcott did not receive its injunction, the court recognized its rights to the check and only Weiss-Lawrence's willingness to pay otherwise prevented the issuance of the injunction and award of the remaining proceeds to Talcott. *See, Robinson v. Fimbel Door Co.,* 113 N.H. 348, 306 A.2d 768–770 (1973).

Further, plaintiff failed to point to any evidence of malice, and Talcott clearly had probable cause to believe in its right to obtain the J. C. Penney check and to prevent others from doing likewise. Compelling evidence of this is the bankruptcy court's recognition of that right, notwithstanding its decision to deny Talcott's request.

█ Abuse of process does not lie because Weiss-Lawrence has adverted to nothing from which it could be found that the defendant used the bankruptcy court proceedings primarily for purposes for which it was not designed. Perhaps,

this finding would be otherwise had Talcott been fully paid when it asked for the J. C. Penney check, but it had not been paid. *See, Restatement, Second, supra* at Illustration 2.

Interference with prospective advantage cannot apply, because plaintiff has referred to no evidence of prospective advantage and no evidence of the cost of losing this putative advantage. In any event, were there evidence of both, then Talcott would have been privileged to go into bankruptcy court as it did to protect its business interests. *Zoby v. Am. Fidelity Co.*, 242 F.2d 76 (4th Cir. 1957).

The motion for summary judgment is granted.